# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

HIGHWAY J CITIZENS GROUP, U.A.
and WAUKESHA COUNTY
ENVIRONMENTAL ACTION LEAGUE
        **Plaintiffs,**

      **v.**                        **Case No. 05-C-0212**

UNITED STATES DEPARTMENT OF
TRANSPORTATION; Secretary of
Transportation NORMAN MINETA;
FEDERAL HIGHWAY ADMINISTRATION;
Administrator of Federal Highway
Administration MARY PETERS; U.S. ARMY
CORPS OF ENGINEERS; District Engineer
MICHAEL F. PFENNING; and FRANK
BUSALACCHI, in his official capacity as
Secretary of the State of Wisconsin
Department of Transportation
               **Defendants.**

---

## <u>DECISION AND ORDER</u>

    Plaintiffs Highway J Citizens Group, U.A. ("Citizens")[1] and Waukesha County

Environmental Action League ("WEAL")[2] filed this action alleging that federal governmental

---

[1]Citizens is an unincorporated association that "represents residents of Waukesha and Washington County who are concerned about the potential destruction of the region along STH 164 and CTH J with a WisDOT proposed 4-lane highway." (Compl. ¶ 10.) According to the complaint, "[t]here are approximately 8,000 members of Citizens, many of whom live along, and enjoy State Highway 164 in its present state." (<u>Id.</u>)

[2]WEAL is a nonprofit corporation "which has been dedicated since 1978 to protecting Waukesha County's natural resources." (Compl. ¶ 11.) WEAL has approximately 100 members, "the overwhelming majority of whom are residents of Waukesha County, including members who live along, and enjoy Highway 164 in its present state." (<u>Id.</u>)

approval of a proposed highway project ("the County J/Highway 164 project") violates federal law. Specifically, pursuant to the Administrative Procedure Act ("APA"),[3] 5 U.S.C. §§ 701-06, plaintiffs challenge: (1) the March 6, 2002 Record of Decision ("ROD") of the Federal Highway Administration ("FHWA"), which authorized the use of federal funds under the Federal Aid Highway Act, as amended by the Transportation Equity Act for the 21st Century, 23 U.S.C. § 101 et seq, in connection with the improvement and expansion of County J/Highway 164 between Interstate 94 and Highway 60 in Waukesha and Washington Counties;[4] and (2) the January 14, 2005 decision of the United States Army Corps of Engineers ("ACOE") to issue a permit under § 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, allowing WisDOT to fill 9.27 acres of wetlands in connection with the County J/Highway 164 project.[5] Plaintiffs challenge the March 6, 2002 ROD on the ground that in reaching its decision the FHWA violated the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 - 4347, and the Federal Aid Highway Act, and they allege that the ACOE's decision to issue a § 404 permit violated the CWA.[6]

On March 17, 2005, plaintiffs moved for a temporary restraining order ("TRO") and a preliminary injunction and sought to prevent defendants from beginning construction on

---

[3]To assist the reader, I have attached an appendix of the acronyms used in this decision.

[4]The roadway expansion project is Wisconsin Department of Transportation ("WisDOT") Project I.D. 2748-01-01.

[5]The permit in dispute is permit number MVP-2004-157290-DJP.

[6]Additionally, the complaint contains passing references to the Wisconsin Environmental Policy Act ("WEPA"), Wis. Stat. § 1.11. However, none of the eight counts of the complaint alleges a WEPA violation, and plaintiffs indicate that they are not presently pursuing a WEPA claim.

2

a particular phase of the roadway project, which was scheduled to begin in April. On March 21, 2005, the judge initially assigned to the case denied plaintiffs' motion for a TRO and ordered defendants to respond to plaintiffs' motion for a preliminary injunction on an expedited basis. Subsequently, the judge recused himself, and the clerk of court randomly reassigned the case to me. This decision and order addresses plaintiffs' motion for preliminary injunction.

## I. STATUTORY OVERVIEW

The present case involves provisions of three federal statutes, NEPA, the Federal Aid Highway Act and the CWA. Before turning to the facts of the case, I will outline the relevant provisions of these statutes.

## A. NEPA

NEPA establishes a "'national policy [to] encourage productive and enjoyable harmony between man and his environment,' and was intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the Untied States." Dep't of Transp. v. Pub. Citizen, 124 S. Ct. 2204, 2209 (2004) (quoting 42 U.S.C. § 4321) (alteration in original). NEPA does not mandate particular results in order to accomplish these ends but instead imposes procedural requirements on federal agencies, which compel them to "undertake analyses of the environmental impact of their proposals and actions." Id. In this regard, NEPA's core provision is its requirement that federal agencies:

> include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--(i) the environmental impact of the proposed action, (ii) any adverse environmental

3

effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C). The regulations interpreting NEPA call this detailed statement an Environmental Impact Statement ("EIS"). <u>See</u> 40 C.F.R. § 1508.11.[7] An EIS is prepared in two stages. First, the agency prepares a draft EIS and receives comments on it from federal and other government agencies and the general public. <u>See id.</u> §§ 1502.9(a) & 1503.1. Then, the agency prepares a final EIS ("FEIS") in which it responds to comments and discusses "any responsible opposing view which was not adequately discussed in the draft statement." <u>Id.</u> § 1502.9(b). Under certain circumstances, the agency may also be required to prepare a supplement to either its draft or final EIS. <u>See id.</u> § 1502.9(c).

Requiring an agency to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), serves two purposes. First, "'[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts.'" <u>Public Citizen</u>, 124 S. Ct. at 2215 (quoting <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 349 (1989)) (alteration in original). Second, "it 'guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.'" <u>Id.</u> at 2215-16. Thus, in an EIS discussing a federal agency's proposal, the agency must "articulate

_____

[7]NEPA established the Council of Environmental Quality ("CEQ") and provided it with authority to issue regulations interpreting NEPA. These regulations are codified at 40 C.F.R. §§ 1500 <u>et seq.</u>

4

why [it has] settled upon a particular plan and what environmental harms (or benefits) [its] choice entails." Simmons v. U.S. Army Corp of Eng'rs, 120 F.3d 664, 666 (7th Cir. 1997). The EIS must show that agency officials have "[thought] through the consequences of – and alternatives to – their contemplated acts," and must ensure that "citizens get a chance to hear and consider the rationales the officials offer." Id.

When an agency makes a decision after preparing and studying an EIS, the agency must memorialize that decision in a ROD. See 40 C.F.R. § 1505.2.

## B. Federal Aid Highway Act

The Federal Aid Highway Act allows state governments to use federal funds in carrying out highway construction projects. See, e.g., Rothrock v. United States, 62 F.3d 196, 198 (7th Cir. 1995) (citing 23 U.S.C. §§ 101(b), 105(a) and 106(a)) . The Act imposes a number of procedural requirements upon projects that receive federal funding. The requirement involved in the present case provides that when a state's proposed highway project "involv[es] the bypassing of, or going through, any city, town, or village," the state must certify to the Secretary of Transportation that "it has had public hearings, or has afforded the opportunity for such hearings." 23 U.S.C. § 128(a). The purpose of this public hearing requirement is "to bring the planners face-to-face with public reaction to their proposals and projects." Coalition of Concerned Citizens Against I-670 v. Damian, 608 F. Supp. 110, 125 (S.D. Ohio 1984).

## C. Clean Water Act

The purpose of the CWA is "'to restore and maintain the chemical, physical, and biological integrity of the nation's waters.'" S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe

of Indians, 541 U.S. 95, 102 (2004) (quoting 33 U.S.C. § 1251). To serve this purpose, the CWA "prohibits 'the discharge of any pollutant by any person' unless done in compliance with some provision of the Act." Id. (quoting 33 U.S.C. § 1311(a)). The provision of the CWA at issue in this case is § 404, which requires an applicant to obtain a permit from the ACOE for the discharge of dredged or fill material into navigable waters of the United States, which include wetlands. 33 U.S.C. § 1344 (codification of § 404); 40 C.F.R. § 230.3(s)(7) (defining "waters of the United States" to include wetlands); Town of Norfolk v. U.S. Army Corps of Eng'rs, 968 F.2d 1438, 1445 (1st Cir. 1992). Guidelines developed by the Environmental Protection Agency in conjunction with the ACOE govern the issuance of a § 404 permit. 33 U.S.C. § 1344(b)(1); Greater Yellowstone Coalition v. Flowers, 359 F.3d 1257, 1269 (10th Cir. 2004). These guidelines, known as § 404(b)(1) guidelines, are published in 40 C.F.R. Part 230. See Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1524-25 (10th Cir. 1992). The ACOE also has its own regulations that apply to the permit process, which are published in 33 C.F.R. Part 320. See Town of Norfolk, 968 F.2d at 1445. The § 404(b)(1) guideline relevant to the present case is 40 C.F.R. § 230.10(a), which provides that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."[8]

---

[8]Thus, unlike NEPA, which does not mandate that an agency make any particular decision so long as it prepares an adequate EIS, the CWA and applicable regulations create substantive restrictions governing when the ACOE can issue a § 404 permit. See Greater Yellowstone Coalition, 359 F.3d at 1273-74; Sierra Club v. United States Army Corps of Eng'rs, 772 F.2d 1043, 1051 (2d Cir. 1985).

6

## III. FACTS

In 1999, the FHWA and WisDOT began studying proposals to address existing and future transportation demand along the County J/Highway 164 roadway. They studied an area starting just north of I-94 on County J, running north along County J and Highway 164, and ending just north of where Highway 164 crosses County E. (See FEIS Ex. 2-9.)[9] Defendants state that they wish to improve the roadway to:

> • Improve safety by reducing conflicts between through and local traffic and providing a facility that meets current design standards for a principal arterial highway.
> • Provide a recommended plan that can be used by local governments as a blueprint to guide future land use and development decisions, and to preserve land for future transportation improvements.
> • Improve local and through traffic access to development and community services adjacent to County J/WIS 164 as well as to destinations outside the corridor.
> • Improve operational efficiency commensurate with the highway's function as a principal arterial and primary north-south route in northern Waukesha County and southern Washington County.
> • Accommodate traffic demand generated by existing and planned development along the County J/WIS 164 corridor as well as in the surrounding region.

(Id. at 1-2 to 1-3.) The FHWA and WisDOT decided to proceed with a proposal that involved expanding the County J/Highway 164 roadway from two to four lanes throughout the entire project area.[10] However, because the proposal was a "major Federal action[] significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), NEPA required the FHWA to prepare an EIS before approving the proposal. On April 9,

---

[9]The record includes portions of the FEIS. (See Exhibit A to March 18, 2005 Affidavit of Jeffrey M. Gonyo, and Defendants' Exhibits 1009 to 1019.)

[10]The proposal involves improvements to the roadway other than expansion to four lanes, but the details are unimportant.

7

2001, FHWA and WisDOT prepared a draft EIS. The draft EIS listed the ACOE as a "cooperating agency." (See Defs.' Ex. 1003 at 1.) On May 30, 2001, WisDOT held what it considered a public hearing under 28 U.S.C. § 128(a), and on December 11, 2001, the FHWA and WisDOT issued a final EIS, again listing ACOE as a cooperating agency. The FEIS recommended the roadway expansion proposal, and the FHWA issued a ROD on March 6, 2002 in which it adopted that proposal.

The agencies have commenced construction of the County J/Highway 164 project and completed the first phase in 2004. They began the second phase in April 2005, shortly after plaintiffs commenced the present action, and propose to commence a third phase in 2006. They have not scheduled construction in a large section of the project area that they are preserving for expansion to four lanes in the future, when the average daily traffic increases to the point where expansion to four lanes becomes necessary.[11]

The second phase of the project involves expanding a 3.8 mile segment of Highway 164 between Swan Road and Prospect Court to four lanes. (See Defs.' Ex. 1039.) Because WisDOT needed to fill wetlands considered "waters of the United States" as part of this phase, it applied to the ACOE for a permit pursuant to § 404 of the CWA. Upon receipt of WisDOT's application, the ACOE determined that the application failed to account for certain wetlands in the project area and asked WisDOT to account for these additional wetlands and supplement its application. WisDOT complied with the ACOE's request, and on December 30, 2004, the ACOE issued a decision in which it recommended that WisDOT's permit application be granted. On January 14, 2005, the

---

[11]Under WisDOT standards, a roadway must be expanded to four lanes when the average daily traffic ("ADT") exceeds 13,000.

8

ACOE issued a permit authorizing WisDOT to fill 9.27 acres of wetlands as part of the second phase of the roadway expansion project.

Additional facts will be stated in the course of this decision.

### III. STANDARDS OF REVIEW

Plaintiffs seek review of two final agency actions: the FHWA's March 6, 2002 ROD, and the ACOE's issuance of a § 404 permit to WisDOT on January 14, 2005. The APA provides the standard of review for plaintiffs' challenges to these decisions. See Highway J Citizens Group v. Mineta, 349 F.3d 938, 952 (7th Cir. 2003) (reviewing NEPA claim pursuant to APA); Greater Yellowstone Coalition, 359 F.3d at 1268 (stating that Corp's compliance with CWA is reviewed pursuant to APA); Coalition of Concerned Citizens Against I-670, 608 F. Supp. at 121-26 (applying APA in reviewing public hearing claim under Federal Aid Highway Act). Under the APA, a court may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). This standard of review is narrow and requires that I "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." Highway J Citizens Group, 349 F. 3d at 952-53 (internal quotation marks and citation omitted). Thus, if

> an agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise[,]

the agency action must be set aside. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). With respect to plaintiffs' NEPA claims, I may not substitute my judgment regarding the environmental consequences of an action for that

9

of the agency. <u>Highway J Citizens Group</u>, 349 F.3d at 953. However, I must "insure that the agency has taken a 'hard look' at environmental consequences." <u>Kleppe v. Sierra Club</u>, 427 U.S. 390, 410 n.21 (1976).

In a suit under the APA, a district court sits as a reviewing court, much like an appellate court. <u>Cronin v. U.S. Dep't of Agric.</u>, 919 F.2d 439, 443-44 (7th Cir. 1990). With few exceptions not relevant here, the court does not take new evidence or hold a trial or evidentiary hearing. <u>Id.</u> Instead, in reviewing the agency action, the court considers only matters within the administrative record. 5 U.S.C. § 706; <u>Fla. Power & Light Co. v. Lorion</u>, 470 U.S. 729, 743-44 (1985).

Because in reviewing plaintiffs' claims I am performing what is essentially an appellate role, a discussion of the proper treatment of plaintiff's motion for preliminary injunction is necessary. As the Seventh Circuit has stated, "the ultimate question to be decided when a plaintiff moves for a preliminary injunction is whether granting, or denying, the motion is the decision that will minimize the costs of error arising from the fact that the motion must be decided without a full hearing on the merits of the plaintiff's claim." <u>Cronin</u>, 919 F.2d at 444-45. Thus, entertaining a request for a preliminary injunction "assumes that the decision whether to grant or deny [the request] is preliminary to a full hearing on the plaintiff's claim." <u>Id.</u> at 445. But in typical APA cases, there will never be a hearing at all; thus, "considerations of irreparable harm are out the window and the only question is whether the plaintiff is entitled to an injunction, period." <u>Id.</u> In such cases, "[a]ll that the plaintiffs are entitled to do in the courts is try to persuade the district judge and then [the court of appeals], on the basis of evidence that was before [the administrative agency at the time of its decision], that the decision is unlawful." <u>Id.</u> However, the Seventh Circuit

10

has recognized that a district court may entertain a preliminary injunction motion in APA cases under certain circumstances.  Id. at 446-47.  One such circumstance is when the administrative record is incomplete when the motion is filed and irreparable harm will occur before the record is completed.  Id. at 446.

In the present case, because I am limited to reviewing the administrative record, most likely I will never hold a hearing on the merits of plaintiffs' claims.  However, the full administrative record has not been filed with the court as of the date of this decision, and I do not know whether plaintiffs have been able to review the full record and, if not, whether they intend to make additional arguments after they do so.  Further, as discussed in more detail below, defendants have raised the affirmative defense of claim preclusion with respect to plaintiffs' challenge to the March 6, 2002 ROD under the APA, NEPA and Federal Aid Highway Act.  In order to resolve the issue of claim preclusion, I must consider facts that are not part of the administrative record.  If such facts are disputed, I may need to hold a hearing to resolve the dispute.[12]  Accordingly, although motions for preliminary injunctions are usually inappropriate in APA cases, I conclude that the procedural posture of this case warrants such a motion.

Generally, the standard governing a motion for a preliminary injunction is as follows.  The party seeking a preliminary injunction has the burden of demonstrating that it has a reasonable likelihood of success on the merits of its claims, that it has no adequate remedy at law, and that it will suffer irreparable harm without the preliminary injunction.  See, e.g.,

---

[12]However, as explained below, plaintiffs do not appear to dispute any of the facts relating to defendants' claim preclusion defense.  Thus, it is unlikely that I will need to hold a hearing on the issue.

11

AM Gen. Corp. v. DaimlerChrysler Corp., 311 F.3d 796, 803 (7th Cir. 2002). If the party seeking the injunction meets those burdens, the court then considers any irreparable harm that the injunction might impose upon the party against which the injunction is sought, and whether the preliminary injunction would harm of foster the public interest. Id. at 803-04. However, "[a] party with no chance of success on the merits cannot attain a preliminary injunction." Id. at 804.

## IV. ANALYSIS

Plaintiffs challenge the FHWA's March 6, 2002 ROD on two grounds. First, they argue that the FHWA issued the ROD in violation of NEPA because the EIS prepared for the County J/Highway 164 project contained an inadequate discussion of the project's environmental impacts. Second, they argue that the FHWA issued the ROD in violation of § 128 of the Federal Aid Highway Act because it failed to hold a proper public hearing on the project. Plaintiffs also challenge the ACOE's decision to issue a § 404 permit in connection with the second phase of the project on the ground that the decision violated 40 C.F.R. § 230.10(a)'s prohibition on issuing a § 404 permit when there exists a "practicable alternative" to the proposed project that would have "less adverse impact on the aquatic ecosystem."

As noted, besides resisting plaintiffs' claims on their merits, defendants argue that plaintiffs' challenge to the March 6, 2002 ROD is barred by claim preclusion. Thus, I consider first whether plaintiffs' challenge to the March 6, 2002 ROD is barred by claim preclusion. Because, as explained in Part A below I conclude that it is, I do not discuss the merits of such challenge. I discuss plaintiffs' challenge to the ACOE's decision to issue a § 404 permit, the only remaining issue, in Part B below.

12

## A. Claim Preclusion

Generally, claim preclusion, also known as <u>res judicata</u>, bars a party from raising a claim that it raised or could have raised in previous litigation. <u>See</u> <u>Nevada v. United States</u>, 463 U.S. 110, 129-30 (1983). To show that a claim is barred by federal claim preclusion,[13] the party seeking to establish the defense must establish three elements: identity of claims, identity of parties or their privies, and a prior final judgment on the merits. <u>See</u> <u>Perry v. Globe Auto Recycling, Inc.</u>, 227 F.3d 950, 952 (7th Cir. 2000); <u>D & K Props.</u> <u>Crystal Lake v. Mut. Life Ins. Co. of N.Y.</u>, 112 F.3d 257, 259 (7th Cir. 1997). If the party establishes these elements, "claim preclusion bars not only those issues which were actually decided in a prior suit, but also all issues which could have been raised in that action." <u>Kratville v. Runyon</u>, 90 F.3d 195, 197-98 (7th Cir. 1996). In the present case, defendants claim that claim preclusion bars plaintiffs' claim that the March 6, 2002 ROD should be set aside because plaintiff Citizens (with whom, argue defendants, WEAL is in privity) challenged the same ROD in a previous case, <u>Highway J Citizens Group U.A. v.</u> <u>Mineta et al.</u>, Case No. 02-C-0662 (E.D. Wis.) ("<u>Citizens I</u>"), which resulted in a judgment on the merits. I consider this argument below.[14]

---

[13]The preclusive effect of a judgment rendered by a federal court depends on federal law. <u>See, e.g.</u>, <u>In the Matter of Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.</u>, 333 F.3d 763, 767 (7th Cir. 2003) ("<u>Bridgestone Tires</u>"). Because the judgment at issue in the present case is a federal court judgment, I apply federal rather than state claim preclusion principles.

[14]Because the parties do not dispute that <u>Citizens I</u> resulted in a judgment on the merits, I discuss only whether <u>Citizens I</u> and the present case involve the same parties and the same claims.

13

### 1. Identity of Parties or Their Privies

The first element of claim preclusion is the identity of the parties or their privies in the two suits. In the context of claim preclusion, "privity" is difficult to define. It is essentially "a descriptive term for designating those with a sufficiently close identity of interests" such that applying claim preclusion to bar a party's claim is proper. Tice v. Am. Airlines, Inc., 162 F.3d 966, 971 (7th Cir. 1998). Privity is a fact-specific question: "whether there was (or should be implied at law) the kind of link between the earlier and later plaintiffs that justifies binding the second [plaintiff] to the result reached against the first." Id.

In the present case, there is no question that plaintiff Citizens and all of the relevant defendants were parties, or were in privity with, parties to Citizens I.[15] However, plaintiff WEAL was not a party to Citizens I, and at oral argument on the present motion, I raised the question of whether WEAL was in privity with Citizens.[16] Defendants responded by arguing that WEAL was "virtually represented" by Citizens in Citizens I. (See Defs.' Supp. Br. [R. 28] at 17.) "Under the doctrine of virtual representation, a person may be bound by

---

[15]Although the ACOE was not a party to Citizens I, the ACOE is a defendant in this case only in connection with its decision to issue a § 404 permit. Defendants do not argue that claim preclusion bars plaintiffs' challenge to the ACOE's decision to issue the permit. Thus, that the ACOE was not a party to Citizens I does not prevent claim preclusion from barring plaintiffs' challenge to the March 6, 2002 ROD.

Further, successors to public office are considered to be in privity with their predecessors. See, e.g., 18 James Wm. Moore et al., Moore's Federal Practice § 131.40[3][e] (3d ed. 2005). Thus, the fact that some of the named state officials in the present suit are successors in office does not prevent a finding that the parties are identical.

[16]As far as I can tell, plaintiffs do not dispute that they were in privity. However, because I raised this issue at oral argument, I will address it here.

14

a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative." In re L & S Indus., 989 F.2d 929, 933 (7th Cir. 1993). The Seventh Circuit views the doctrine of virtual representation not as a form of privity, but as a separate theory for applying claim preclusion to a party who was not a party to the relevant previous litigation. See Tice, 162 F.3d at 971. Viewed as a doctrine distinct from privity, the Seventh Circuit has disapproved of virtual representation. See Bridgestone Tires, 333 F.3d at 769; Perry, 227 F.3d at 953; Tice, 162 F.3d at 970-74. However, the Seventh Circuit has stated that the doctrine is not "lifeless," Monfils v. Taylor, 165 F.3d 511, 521 (7th Cir. 1998), and applies its principles within the context of privity, Tice, 162 F.3d at 971. As the court stated in Tice, "[a] proper functional analysis of privity, focusing on the general question whether the earlier parties were in some sense proper agents for the later parties, [supports] preclusion in the cases that have used the lingo of virtual representation." Id.

Thus, to determine whether WEAL and Citizens were in privity, I must determine whether Citizens was in some sense a proper agent for WEAL in Citizens I. Whether preclusion is appropriate "depend[s] on how closely the two [parties'] sets of interests coincide and the role the absentees played in the earlier litigation." Id. at 973. "At a minimum . . . the claims and defenses of the two allegedly equivalent parties (earlier litigant, present litigant) must be the same." Id. Further, "there should be some indication not only that the second party was aware that the first litigation was going on and that the earlier litigation would resolve its claims, but also that the second party either had participated or had a legal duty to participate." Id.

Applying the above principles to the present case, I conclude that defendants have shown that WEAL was in privity with Citizens. First, as explained <u>infra</u> Part IV.A.2, the claims of Citizens in <u>Citizens I</u> and of WEAL and Citizens in the present case are identical. Second, Citizens and WEAL have identical interests in the suit, and had identical interests in <u>Citizens I</u>. That is, both are citizens groups opposed to the County J/Highway 164 project. <u>See</u> <u>supra</u> n.1 & n.2. Indeed, the complaint in the present case does not distinguish between the two groups when describing the interests of its members. (<u>See</u> Compl. ¶¶12-15.) Finally, there is more than "some indication" that WEAL was aware that <u>Citizens I</u> was going on and that WEAL had participated in that case. WEAL's website contains a letter from Jeff Gonyo, a member of Citizens, describing the present lawsuit and soliciting donations from WEAL members to pay legal fees in connection with the suit. This letter demonstrates that WEAL and WEAL members knew of, and participated in, <u>Citizens I</u>. It states:

> For the past six years, WEAL has been a <u>very strong supporter</u> of our citizens's groups's [i.e., Citizens's] grassroots efforts to <u>stop</u> the Highway 164 four-lane expansion and their [i.e., WEAL's] Board of Directors has made <u>many generous donations</u> to help pay for our group's past legal fees. By joining our citizens group as a co-plaintiff in this current lawsuit, WEAL is promising to make a <u>$1,000 donation</u> to help out with our legal fees once again. We are <u>very appreciative</u> of WEAL's continuing support of our efforts.

(Defs.' Ex. 1043 at 4 (emphasis in original).) The letter concludes by "strongly encouraging" Citizens members to become members of WEAL. (<u>Id.</u>) Although this letter never specifically mentions <u>Citizens I</u>, the context of the letter makes clear that WEAL knew about, supported, and contributed to Citizens's legal expenses in <u>Citizens I</u>. At the least, that is what defendants have represented this letter as stating, and plaintiffs have not disputed such representation. Thus, because WEAL's and Citizens's interests are

16

identical, and because WEAL knew about and participated in Citizens I, I find that WEAL was in privity with Citizens.[17]

## 2. Identity of Claims

Defendants argue that in Citizens I, Citizens sought to set aside the March 6, 2002 ROD under the APA and that plaintiffs' current challenge to the same ROD under the APA is part of the same claim as the prior challenge. To evaluate defendants' argument, I must determine whether Citizens challenged the March 6, 2002 ROD in Citizens I and, if I determine that it did, determine whether plaintiffs' current challenge to the ROD is part of the "same claim."

### a. Whether Citizens Challenged March 6, 2002 ROD in Citizens I

Predominantly, Citizens I involved a challenge under the APA to a WisDOT/FHWA project known as the "Ackerville Bridge project."[18] This project, which occurred on Highway 164 adjacent to the northern terminus of the County J/Highway 164 project, involved the construction of a bridge and the reconstruction of Lovers Lane Road in Washington County. The FHWA approved the Ackerville Bridge and County J/Highway 164 projects in separate RODs. Because WisDOT and FHWA viewed the Ackerville Bridge project as

_____

[17]Whether WEAL and Citizens were in privity is a question of fact, see Tice, 162 F.3d at 971 (stating that privity is a "fact-specific" question), on which defendants bear the burden of proof, see, e.g., ITOFCA, Inc. v. MegaTrans Logistics, Inc., 322 F.3d 928, 933 (7th Cir. 2003) (Ripple, J., concurring). However, as explained in the text, defendants have submitted undisputed evidence showing that WEAL and Citizens were in privity. Thus, for purposes of evaluating plaintiffs' motion for a preliminary injunction, I find that plaintiffs have no likelihood of showing that Citizens and WEAL were not in privity.

[18]The Ackerville Bridge project is WisDOT Project I.D. # 2748-01-00. A more detailed statement of the facts surrounding the project can be found in the Seventh Circuit's opinion in Citizens I. See Highway J Citizens Group, 349 F.3d at 941-63.

distinct from the County J/Highway 164 project, the EIS governing the latter project did not address the environmental impacts of the former.  Further, WisDOT and FHWA did not prepare a separate EIS for the Ackerville Bridge project because they determined that the applicable regulations did not require one.[19]

Citizens raised three issues in Citizens I.  First, it argued that WisDOT's and FHWA's decision to treat the Ackerville Bridge project and the County J/Highway 164 project as separate projects violated NEPA, the applicable regulations and the APA.[20]  Citizens further argued that, even if the projects were legitimately distinct, the FHWA's decision to approve the Ackerville Bridge project without preparing an EIS had to be set aside under the APA.  Highway J Citizens Group, 349 F.3d at 952-60.  Finally, Citizens argued that the decision to approve the Ackerville Bridge project violated the APA because WisDOT and FHWA did not consider sufficient reasonable alternatives to the project, as required by NEPA.  Id. at 960-62.  The relief requested in Citizens I included enjoining the defendants from proceeding with further work on the Ackerville Bridge project, requiring the defendants to prepare an EIS for that project, requiring the defendants to prepare a FEIS

_____

[19]CEQ and other agency regulations govern when an agency must prepare an EIS. Under the regulations, when a proposed action is neither one normally requiring an EIS nor one categorically excluded from the EIS process, the agency must prepare an environmental assessment ("EA").  Highway J Citizens Group, 349 F.3d at 953.  An EA is a "shorter, rough-cut, low-budget EIS . . ., 'which provide[s] evidence and analysis that establish[es] whether or not an EIS or a Finding of No Significant Impact ('FONSI') should be prepared.'"  Id. (quoting 40 C.F.R. § 1508.9(a)(1)) (alterations in original).  A FONSI "briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment."  Public Citizen, 124 S. Ct. at 2210.

[20]In the terminology of NEPA case law , Citizens argued that the County J/Highway 164 project was improperly "segmented" from the Ackerville Bridge project .  See Highway J Citizens Group, 349 F.3d at 962-63.

18

"for all of the County J/Highway 164 project, including that portion consisting of" the Ackerville Bridge project, and "[p]reliminarily and permanently enjoining the defendants from widening County J/Highway 164 from I-94 in Waukesha County to STH 60 in Washington County from two to four lanes." (Citizens I Compl. at 13-14.)[21]

In the present case, plaintiffs argue that they did not challenge the March 6, 2002 ROD in Citizens I. Specifically, they argue that "while both [the Ackerville Bridge project and the County J/Highway 164 project] were indeed mentioned or referred to in that litigation, [Citizens I] concerned the plaintiff's challenges to one of the projects, that being the Ackerville Bridge project." (Pls.' Reply Br. [R. 23] at 3 (emphasis in original)). However, although Citizens never mentioned the March 6, 2002 ROD in Citizens I, it is clear that it challenged that decision in that case when it argued that the County J/Highway 164 project was improperly segmented from the Ackerville Bridge project.[22] A claim that

---

[21]The Citizens I complaint is part of the record in the present case as Defendants' Exhibit 1021.

[22]Whether one highway project was improperly segmented from another is governed by a FHWA regulation, 23 C.F.R. 771.111(f)(1)-(3). See Highway J Citizens Group, 349 F.3d at 962. This regulation provides as follows:
> (f) In order to ensure meaningful evaluation of alternatives and to avoid commitments to transportation improvements before they are fully evaluated, the action evaluated in each EIS or finding of no significant impact (FONSI) shall:
> > (1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;
> > (2) Have independent utility or independent significance, i.e., be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and
> > (3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

Id.

19

one project was improperly segmented from another is necessarily a claim that the environmental review conducted for each project was inadequate because each review failed to consider the environmental effects of the other project. Thus, a claim of improper segmentation is a claim that a court must set aside each decision approving the segmented projects under the APA because neither decision complied with NEPA and the applicable regulations and therefore both decisions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Accordingly, in Citizens I, by arguing that WisDOT and FHWA improperly segmented the County J/Highway 164 project from the Ackerville Bridge project, Citizens argued that (1) the ROD approving the Ackerville Bridge project had to be set aside under the APA because the FHWA failed to assess the environmental impacts of the project through an EIS that included the County J/Highway 164 project; and (2) the ROD approving the County J/Highway 164 project had to be set aside under the APA because the FHWA failed to assess the environmental impacts of the project through an EIS that included the Ackerville Bridge project. Indeed, Citizens must have recognized that success on their segmentation claim in Citizens I entailed the invalidation of the ROD which approved the County J/Highway 164 project because, in that case, Citizens sought to enjoin the County J/Highway 164 project and compel FHWA and WisDOT to prepare an EIS governing both projects. (See Citizens I Compl. at 13-14.)

Thus, I conclude that Citizens challenged the March 6, 2002 ROD in Citizens I.[23]

---

[23]In arguing that Citizens did not challenge the County J/Highway 164 project in Citizens I, plaintiffs rely on language in the Seventh Circuit's opinion in that case stating that the County J/Highway 164 project "is relevant to this litigation only because Citizens believes that it was improperly segmented from the Ackerville Bridge Project." Highway

20

b. **Whether Present Challenge to March 6, 2002 ROD is a Different "Claim."**

Having determined that Citizens challenged the March 6, 2002 ROD in <u>Citizens I</u>, the question becomes whether plaintiffs' current challenge to the same ROD is the "same claim" for claim preclusion purposes. <u>See, e.g.</u>, <u>Herrmann v. Cencom Cable Assocs., Inc.</u>, 999 F.2d 223, 226-27 (7th Cir. 1993) (explaining that claim preclusion bars relitigation of the same claim). If two purported claims are really one, prior litigation of one such "claim" bars litigation of the second in a subsequent lawsuit. <u>Id.</u> However, as numerous courts and commentators have recognized, the standard for when two claims are so closely related that they are really the same is not precise. <u>See, e.g.</u>, <u>Colonial Penn Life Ins. Co. v. Hallmark Ins. Adm'rs, Inc.</u>, 31 F.3d 45, 447 (7th Cir. 1994); <u>Herrmann</u>, 999 F.2d at 226-27; 18 Moore et al, <u>supra</u>, § 131.20 (stating that there is no bright line test for determining whether claim was subject of prior action and providing overview of various courts' approaches to the issue). The Seventh Circuit has "suggest[ed]" that "two claims are one for purposes of [claim preclusion] if they are based on the same, or nearly the same, factual allegations." <u>Herrmann</u>, 999 F.2d at 226. In other cases, the Seventh Circuit has examined whether the claims are part of the "same transaction" or involve a "single core of operative facts giving rise to a remedy." <u>Doe v. Allied-Signal, Inc.</u>, 985 F.2d 908, 913 (7th Cir. 1993) (internal quotation marks and citation omitted). The court has also stated

_____

<u>J Citizens Group</u>, 349 F.3d at 942. However, as explained in the text, by bringing in the County J/Highway 164 project as part of its segmentation argument, Citizens necessarily challenged the FHWA's decision to approve the project. Thus, although Citizens challenged the County J/Highway 164 project in <u>Citizens I</u> "only because" it believed that it was improperly segmented, <u>id.</u>, that does not mean that it did not, in fact, challenge such project.

21

that "[o]nce a transaction has caused injury, all claims arising from that transaction must be brought in one suit or lost," and that "[a] plaintiff may not avoid an earlier judgment on the merits by merely concocting a new legal theory." Id. at 913-14 (internal quotation marks and citation omitted).

Although the applicable standard is imprecise, it is clear that under any of the above formulations, plaintiffs' present challenge to the March 6, 2002 ROD is the same claim as the claim that Citizens raised in Citizens I involving the same ROD. Both challenges involve "the same, or nearly the same factual allegations," arise out of the "same transaction," and involve a common "core of operative facts," i.e., the approval of the County J/Highway 164 project. Further, plaintiffs have advanced no persuasive reason for finding that their current challenge to the March 6, 2002 ROD should be viewed as a different claim. Essentially, plaintiffs argue that they should be able to challenge the March 6, 2002 ROD in the present case because they are challenging it for different reasons than Citizens did in Citizens I. That is, they argue that in Citizens I, Citizens challenged the ROD under NEPA on improper segmentation grounds, whereas in the present case, plaintiffs challenge the ROD on the ground that it violated NEPA in numerous other respects and § 128 of the Federal Aid Highway Act. However, accepting plaintiffs' argument would mean that the same party could bring successive APA challenges to the same agency decision so long as in each lawsuit the party raised a new reason for invalidating the decision. For example, a party could bring an initial suit raising improper segmentation under NEPA, a second suit raising a second NEPA violation, a third suit raising a third NEPA violation, a fourth suit raising a violation of § 128 of the Federal Aid Highway Act, a fifth suit alleging that the Federal Aid Highway Act is unconstitutional, etc.

22

Allowing a party to bring such successive claims would defeat the value of finality that claim preclusion is designed to protect. See, e.g., Tice, 162 F.3d at 970 (explaining that claim preclusion serves the needs of litigants and the judicial system alike for finality of decisions after a full and fair airing of the matter"); 18 Moore et al, supra, § 131.12[3][2] (explaining that the concept of finality is central to doctrine of claim preclusion). Thus, I cannot accept plaintiffs' argument that a party can bring successive challenges to the same agency decision as long as each successive challenge raises a new reason for overturning the decision.

Finally, plaintiffs seem to argue that because Citizens I was primarily about the Ackerville Bridge project, they should be able to raise new challenges to the County J/Highway 164 project in the present case. However, although Citizens I was primarily about the challenge to the Ackerville Bridge project, as explained above, Citizens also raised the County J/Highway 164 claim in its first suit.[24] And there is no exception to claim preclusion which allows parties to relitigate a claim on the ground that they only litigated that claim a little bit, or to a lesser extent than another claim, in their first suit. Rather, as long as the first suit provided the opportunity to fully litigate a raised claim (and plaintiffs here do not claim that Citizens was denied a full and fair opportunity to litigate the County J/Highway 164 claim in Citizens I), claim preclusion bars any subsequent relitigation. See

---

[24]Under the analysis set forth in the text, the challenge to the decision to approve the Ackerville Bridge project was a different claim than the claim involving the County J/Highway 164 project because the former arose out of a separate set of facts or a separate transaction than the latter. Thus, in Citizens I, Citizens raised two distinct claims for claim preclusion purposes – the claim involving the County J/Highway 164 project and the claim involving the Ackerville Bridge project. Had Citizens confined itself to challenging the Ackerville Bridge Project in Citizens I, the judgment in that case would not preclude its challenge to the County J/Highway 164 project in the present case.

Pirela v. Vill. of N. Aurora, 935 F.2d 909, 913 (7th Cir. 1991) (stating that claim preclusion bars party from litigating a claim if party had a full and fair opportunity to litigate claim in prior lawsuit).

Thus, for the reasons stated, I conclude that Citizens raised plaintiffs' present challenge to the March 6, 2002 ROD in Citizens I. Accordingly, because Citizens I and the present case also involve identical parties or their privies, and because Citizens I resulted in a judgment on the merits, I conclude that claim preclusion likely bars plaintiffs' present challenge to the March 6, 2002 ROD. Plaintiffs therefore have not shown a likelihood of success on the merits of their claim involving NEPA and the Federal Aid Highway Act, and their motion for preliminary relief based on such claim will be denied.

**B. Clean Water Act**

The § 404(b)(1) guidelines provide that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). A "practicable alternative" is one that "is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." Id. § 230.10(a)(2). If a proposed project does not require access or proximity to or siting within wetlands to fulfill its basic purpose, i.e., if the project is not "water dependent," practicable alternatives are presumed to be available, "unless clearly demonstrated otherwise." See id. § 230.10(a)(3). Courts have held that when a project is not water dependent, the ACOE "may not issue a § 404 permit unless the applicant, with independent verification by the [ACOE], provides detailed, clear and convincing information

24

proving that an alternative with less adverse impact is impracticable." Greater Yellowstone Coalition, 359 F.3d at 1269 (internal quotation marks, alterations and citation omitted, emphasis in original). "This presumption of practicable alternatives is very strong." Nat'l Wildlife Fed'n v. Whistler, 27 F.3d 1341, 1344 (8th Cir. 1994) (internal quotation marks and citation omitted, emphasis in original). However, the Supreme Court has stated that "the concept of alternatives must be bounded by some notion of feasibility," and that:

> [c]ommon sense also teaches us that [a discussion of alternatives] cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man. Time and resources are simply too limited to hold that [a discussion] fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved.

Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 551 (1978).

In the present case, the County J/Highway 164 project is not water dependent, and thus the presumption of existing practicable alternatives attaches, and the ACOE is required to "clearly demonstrate" that there are no practicable alternatives to the project. Plaintiffs contend that the ACOE has not met this burden because it failed to consider an alternative that plaintiffs call the "Old Highway 164" alternative and because the ACOE's evaluation of alternatives involved an understatement of the amount of wetlands impacted by the County J/Highway 164 project.

25

## 1. Failure to Consider "Old Highway 164" Alternative

Plaintiffs contend that the ACOE has not clearly demonstrated that an "off-alignment alternative"[25] – which plaintiffs label "the Old Highway 164" alternative – is impracticable. (See Pls.' Letter Br. [R. 25] at 2-3.)[26]  This alternative proposes routing traffic from I-94 to US 41-45 via Old Highway 164 and Highways VV, 74 and Y.[27]  The route begins by taking Old Highway 164, an existing four-lane highway, north to Highway VV.  Traffic turns east on VV to Highway 74, takes Highway 74 to Highway Y, and then takes Highway Y to the US 41-45 interchange.  The alternative involves widening Highways VV and 74 to four lanes; Highway Y would also be expanded to four lanes, but WisDOT has already decided to widen Highway Y as part of a different project, and thus only Highways VV and 74 would need to be widened to construct the Old Highway 164 alternative.  Plaintiffs argue that this alternative would impact fewer wetlands than the County J/Highway 164 project but still serve the project's purposes.

---

[25]As the FEIS uses the phrase, "off-alignment alternatives" are alternatives that involve diverting traffic through roadways other than County J/Highway 164 so as to avoid the need to expand County J/Highway 164 to four lanes.  (See FEIS at 2-4 to 2-5.)

[26]Initially, plaintiffs also argued that the ACOE failed to consider an alternative referred to as the "Power Line" or "Power Corridor" alternative.  (See Pls.' Br. In Supp. [R. 7] at 25.)  However, at oral argument, plaintiffs stated that they were no longer pursuing this argument.  (Tr. at approx. 64.)  (Citations to the transcript of the oral argument held on the present motion are approximate because the final transcript was not prepared at the time of this decision.)

[27]In describing this alternative, I rely on plaintiffs' description on page two of their letter brief [R. 25], and am comparing it with Defendants' Exhibit 1038.  "Old Highway 164" is the roadway labeled "164" just east of the County J/Highway 164 project on Defendants' Exhibit 1038.  To avoid confusion, I note that many other proposed alternatives to the County J/Highway 164 project incorporate Old Highway 164.  However, references to "the Old Highway 164 alternative" in this decision are references to the alternative described in the text.

26

Neither the FEIS or the ACOE's decision approving the § 404 permit contains a discussion of the Old Highway 164 alternative. However, the FEIS, on which the ACOE relied in analyzing practicable alternatives, considered and rejected a number of other off-alignment alternatives involving Old Highway 164. (See FEIS Exs. 2-5, 2-6 & 2-8.) Further, plaintiffs have not cited to any part of the administrative record indicating that anyone ever brought the Old Highway 164 alternative to the ACOE's attention before it approved the § 404 permit. Although plaintiffs claim that "the Old Highway 164 alternative was raised at the first Project Advisory Committee meeting on Aug. 10, 1999" (Pls.' Letter Br. [R. 25] at 2), the portions of the record cited do not support this claim.[28] Plaintiffs also state that the "failure to consider this alternative in the Draft EIS was objected to in public comments." (Id.) But again, the part of the record cited does not support the assertion.[29]

_____

[28]Specifically, plaintiffs cite page 8-2 of the FEIS, but I do not see any reference to what plaintiffs describe as the Old Highway 164 alternative on that page. Page 8-3 states that Citizens advocated an alternative that involved improving "the Old WIS 164/County Y/US 41 and US 45 corridor," but this could be a reference to what the FEIS discussed and described as the "County Y Corridor" alternative. (See FEIS at 2-15 & Ex. 2-8.) Plaintiffs also cite paragraph nine of Gonyo's initial affidavit [R. 7, attachment #1] in support of their contention that they raised the Old Highway 164 alternative during the EIS process, which states that "[a]s early as the first Project Advisory Committee meeting on August 10, 1999, . . . the agency was asked to consider maintaining highway J/164 as an improved 2-lane highway and improving 'Old Highway 164' as an alternative to the proposed project." However, almost every off-alignment alternative involved maintaining County J/Highway 164 as an improved two-lane highway and improving Old Highway 164. (See FEIS Exs. 2-5, 2-6 & 2-8.) Thus, Gonyo's affidavit does not indicate that anyone raised the Old Highway 164 alternative during the EIS process, as opposed to one of the other alternatives involving Old Highway 164.

[29]Specifically, plaintiffs cite DOT313WIS of Defs.' Ex. 1007 in support of their assertion. This document states that "WisDOT also failed to consider expanding old Highway 164 to 74 to Highway Y, a possibly less disruptive alternative." However, like the FEIS and Gonyo Affidavit, this document does not go into sufficient detail so as to distinguish what plaintiffs refer to as the Old Highway 164 alternative from other alternatives involving Old Highway 164 which defendants considered, such as the County

27

Indeed, the plaintiffs did not make clear what they meant by "the Old Highway 164 alternative" until oral argument on the present motion and a letter they filed in response to the court's question about what they meant. (See Pls.' Letter Br. [R. 25] at 2.) Prior to oral argument, defendants and I thought plaintiffs' references to the Old Highway 164 alternative were references to the County Y Corridor alternative. (See Defs.' Br. in Opp. [R. 19] at 25; Tr. at approx. 65-68.) Thus, as far as the record reveals, no one brought the Old Highway 164 alternative and its potential advantages over the selected alternative to the ACOE's attention before it decided to issue the § 404 permit.

Because no one brought the Old Highway 164 alternative to the ACOE's attention during the permit review process, the ACOE's failure to demonstrate that this alternative was impracticable does not render its decision to issue a § 404 permit to WisDOT arbitrary and capricious. As stated, the § 404(b)(1) guidelines do not require the ACOE to rule out every conceivable alternative, "regardless of how uncommon or unknown that alternative may have been at the time the project was approved." Vt. Yankee, 435 U.S. at 551. Based on the present record, the Old Highway 164 alternative appears to have been unknown to the ACOE at the time it decided to issue the permit. The study area of the County J/Highway 164 project involved numerous alternative streets (see FEIS Ex. 2-9), the various combinations of which could have provided a large number of alternative routes. The ACOE cannot be expected to evaluate every possible combination of streets and explain why each individual alternative route is impracticable as compared to the

---

Y Corridor alternative. In any event, even if this document is specific enough to distinguish the Old Highway 164 alternative from other similar alternatives, it does not explain why that alternative warranted separate discussion. Instead, it simply asserts that the Old Highway 164 alternative was "possibly less disruptive."

28

selected alternative.  See id. (stating that "[t]ime and resources are simply too limited to hold that [a discussion of alternatives] fails because the agency failed to ferret out every possible alternative").

Perhaps if the Old Highway 164 alternative were obviously superior to the chosen alternative, the ACOE's failure to rule it out could be deemed arbitrary and capricious even though no one brought it to the ACOE's attention and explained its advantages.  However, the record contains no indication that the Old Highway 164 alternative was obviously superior.  Although plaintiffs believe that the alternative would have met all of the project's goals while impacting fewer wetlands, the record suggests a number of possible problems with the route.   First, to construct plaintiffs' alternative, WisDOT would have had to construct an expensive railroad crossing, which would have increased the project's cost. (See Defs.' Ex. 1046 at 6.)  Second, the FEIS indicates that off-alignment alternatives similar to the Old Highway 164 alternative would not have met the goals of the project because they were "inconsistent with regional and county transportation system plans that document the importance of County J/WIS 164 as a major north-south arterial and the need for capacity expansion" on that roadway.  (FEIS at 2-15.)  Thus, the Old Highway 164 alternative was not an obvious alternative that the ACOE should have discussed even though no one proposed it.

Accordingly, for the reasons stated, I conclude that the ACOE's failure to discuss the Old Highway 164 alternative did not render its decision to issue a § 404 permit arbitrary and capricious.

29

## 2. Understatement of Wetlands Impacts

According to plaintiffs, the FEIS states that the second phase of the County J/Highway 164 project will impact 5.27 acres of wetlands.[30]  However, the § 404 permit issued to WisDOT allows it to fill 9.27 acres of wetlands as part of the second phase, a difference of four acres.  Plaintiffs argue that although the ACOE recognized that the FEIS understated the wetlands impacts of the County J/Highway 164 project, it nonetheless relied on the FEIS's comparison of alternatives in conducting its practicable alternatives analysis.  Plaintiffs state that this rendered the ACOE's consideration of practicable alternatives inadequate because such consideration did not take into account the actual wetlands impacts of the County J/Highway 164 project when comparing it to the alternatives.

However, as stated, the § 404(b)(1) guidelines prohibit the ACOE from issuing a permit for a project if there is a practicable alternative that will have "less adverse impact on [wetlands], so long as [that alternative] does not have other significant adverse environmental consequences."  40 C.F.R. § 230.10(a).  The FEIS's understatement of the amount of wetlands impacted by the County J/Highway 164 project only affects one part of this alternatives analysis, i.e., whether an alternative will have a less adverse impact on wetlands than the applicant's preferred alternative.  It does not affect whether an alternative is practicable or whether it will have other adverse environmental consequences.  Thus, the ACOE's reliance on the four-acre understatement in the FEIS

_____

[30]Plaintiffs represent that phase two will impact the wetlands listed as W-6 to W-16 on Table 4-12 on page 4-37 of the FEIS.  (Pls.' Br. in Supp. [R. 7] at 18-19.)  By my calculation, that means that the FEIS represents that phase two will impact 5.27 acres of wetlands.

30

would matter only if it rendered the ACOE's conclusion that a particular practicable alternative would impact more wetlands than the County J/Highway 164 project erroneous. However, the ACOE did not reject any practicable alternative on the ground that it impacted four or fewer acres of wetlands more than the County J/Highway 164 project. The only alternatives that the ACOE rejected, even partly, on the ground that such alternatives impacted more wetlands than the County J/Highway 164 project, impacted at least five additional acres of wetlands.[31]  Specifically, the FEIS stated that Alternative 3F impacted at least 6.5 acres of wetlands more than the County J/Highway 164 project (FEIS at 2-9), that Alternative 3G impacted at least 5 acres more (id. at 2-9 to 2-10), that the Power Corridor alternative impacted at least 43 acres more (id. at 2-14), and that the WIS 16 Corridor alternative impacted 11 acres more (id. at 2-16).  Reducing the difference between each of these alternatives and the County J/Highway 164 project by four acres results in each alternative still impacting more acres of wetlands than the project – 2.5, 1, 39 and 7 acres, respectively.

Thus, even assuming that plaintiffs are correct and that the FEIS understated the amount of wetlands impacted by the County J/Highway 164 project by four acres, using the proper acreage in comparing alternatives would not have revealed a practicable alternative having a less adverse impact on wetlands.  Accordingly, the ACOE's reliance on the FEIS

---

[31]The ACOE did not reject any alternative solely because it impacted more acres of wetlands than the County J/Highway 164 project.  Instead, the ACOE rejected the alternatives for a combination of reasons, including that they did not meet project goals (i.e., were impracticable) and had other adverse impacts.  (See generally FEIS Section 2.) Thus, even if the four-acre understatement would have resulted in an alternative impacting fewer wetlands than the County J/Highway 164 project, the ACOE would not necessarily have acted arbitrarily and capriciously in issuing a § 404 permit for phase two construction.

as part of its practicable alternatives analysis did not render its decision to issue a § 404 permit arbitrary and capricious. Plaintiffs' challenge to this decision therefore fails.[32]

## V. CONCLUSION

For the reasons stated, I conclude that claim preclusion likely bars plaintiffs' challenge to the March 6, 2002 ROD based on the APA, NEPA and the Federal Aid Highway Act. Plaintiffs therefore do not have a reasonable likelihood of success on the merits of this claim, and I will deny their motion for preliminary relief. Further, I conclude that plaintiffs' challenge to the ACOE's decision to issue § 404 permit to WisDOT fails and that plaintiffs therefore have no likelihood of success on this claim. These conclusions most likely resolve this case. However, as noted, because the administrative record was not complete as of the date of this decision, and because plaintiffs may want to present evidence contradicting defendants' evidence showing that WEAL and Citizens are in privity, I will consider whether to permit further proceedings. Thus, I will schedule a telephonic conference to determine whether further proceedings are necessary or whether final judgment should be entered.

**THEREFORE, IT IS ORDERED** that plaintiffs' motion for a preliminary injunction is **DENIED**.

---

[32]Plaintiffs also criticize the ACOE's reliance on the wetlands delineation provided by WisDOT in determining the overall amount of wetlands in the project area. Specifically, plaintiffs claim that WisDOT's delineation was outdated. However, the ACOE considered not just WisDOT's five-year-old information, but also more recent information contained in the ACOE's files. (See Defs.' Ex. 1026.) Further, the ACOE considered and rejected plaintiffs' expert's criticism of WisDOT's wetlands delineation. (See Defs.' Ex. 1031 at 35-36.) Thus, because the ACOE did not "uncritically accept[]" WisDOT's wetlands delineation, Friends of the Earth v. Hintz, 800 F.2d 822, 835-36 (9th Cir. 1986), I conclude that the ACOE's use of such delineation was not arbitrary and capricious.

32

**IT IS FURTHER ORDERED** that a telephonic status conference will be held on **May 18, 2005 at 10:30 a.m. CDT.** The court will initiate the call.

Dated at Milwaukee, Wisconsin, this 27 day of April, 2005.

/s_____
LYNN ADELMAN
District Judge

**APPENDIX**

ACOE:       United States Army Corps of Engineers

ADT:        Average Daily Traffic

APA:        Administrative Procedure Act

CEQ:        Council on Environmental Quality

CWA:        Clean Water Act

EA:         Environmental Assessment

EIS:        Environmental Impact Statement

FEIS:       Final Environmental Impact Statement

FHWA:       Federal Highway Administration

FONSI:      Finding of No Significant Impact

NEPA:       National Environmental Policy Act

ROD:        Record of Decision

TRO:        Temporary Restraining Order

WEAL:       Waukesha County Environmental Action League

WEPA:       Wisconsin Environmental Policy Act

WisDOT:     Wisconsin Department of Transportation

34