# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

HIGHWAY J CITIZENS GROUP, U.A.
and WAUKESHA COUNTY
ENVIRONMENTAL ACTION LEAGUE
       Plaintiffs,

      v.                              Case No. 05-C-0212

UNITED STATES DEPARTMENT OF
TRANSPORTATION; Secretary of
Transportation RAY LaHOOD;
FEDERAL HIGHWAY ADMINISTRATION;
Acting Administrator of Federal Highway
Administration JEFFREY PANIATI; U.S. ARMY
CORPS OF ENGINEERS; District Engineer
COLONEL JON L. CHRISTENSEN; and FRANK
BUSALACCHI, Secretary of the State of Wisconsin
Department of Transportation
                Defendants.

## DECISION AND ORDER

In 2005, plaintiffs Highway J Citizens Group, U.A. ("Citizens"), and Waukesha County Environmental Action League ("WEAL") commenced this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, on behalf of their members, alleging that defendants, the Federal Highway Administration ("FHWA"), Army Corps of Engineers (the "Corps") and the Wisconsin Department of Transportation ("WisDOT"), acted arbitrarily and capriciously in approving a highway expansion project in Southeastern Wisconsin. On April 27, 2005, I denied plaintiffs' motion to preliminarily enjoin the project. Plaintiffs appealed, the court of appeals affirmed, and plaintiffs sought review by the Supreme Court.

The Court denied review, and plaintiffs proceeded with the litigation in this court. Before me now are the parties' cross-motions for summary judgment.

## I. BACKGROUND

In 1999, the FHWA and WisDOT began studying proposals to address existing and future transportation needs along the County J/Highway 164 corridor in Waukesha and Washington Counties, Wisconsin.[1] The FHWA and WisDOT worked together because although WisDOT was primarily responsible for the project, federal funds managed by the FHWA would be used to construct it. The relevant project area starts just north of I-94 on County J, runs north along County J and Highway 164, and ends just north of the intersection of Highway 164 and County E. See Final Environmental Impact Statement [hereinafter "FEIS"] at Ex. 2-9.[2] The FHWA and WisDOT found that improvements in this area were necessary in order to:

> • Improve safety by reducing conflicts between through and local traffic and providing a facility that meets current design standards for a principal arterial highway.
>
> • Provide a recommended plan that can be used by local governments as a blueprint to guide future land use and development decisions, and to preserve land for future transportation improvements.
>
> • Improve local and through traffic access to development and community services adjacent to County J/WIS 164 as well as to destinations outside the corridor.
>
> • Improve operational efficiency commensurate with the highway's function as a principal arterial and primary north-south route in northern Waukesha County and southern Washington County.

---

[1]In the interest of simplicity, I will refer to County J/Highway 164 as "Highway 164."

[2]The FEIS can be found in volume six of the administrative record, beginning at FHWA 03820.

2

• Accommodate traffic demand generated by existing and planned development along the County J/WIS 164 corridor as well as in the surrounding region.

Id. at 1-2 to 1-3. The FHWA and WisDOT decided that these needs would be best addressed by expanding the County J/Highway 164 corridor from two to four lanes. Because the expansion would be a "major Federal action[] significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 - 4347, required the FHWA to prepare an environmental impact statement. The agency completed the FEIS on December 11, 2001. On March 6, 2002, the FHWA issued a record of decision ("ROD") in which it explained its decision to expand the highway.[3]

The FHWA and WisDOT plan to complete the expansion project in eight phases over the course of decades. FEIS Ex. 2-9. The exact time frame will be determined by traffic volume. The latter phases of the project will not be implemented until the "average daily traffic" or "ADT" on the stretch of Highway 164 included in those phases reaches 13,000. ROD at 2. However, the first three phases of the project, which involve areas that have already reached 13,000 ADT, have been completed. Defendants estimate that traffic on the remaining five phases of the project will not reach 13,000 ADT until 2018, at the earliest. Thus, unless traffic volume increases faster than expected, the roadway will not be expanded to four lanes in the remaining areas until sometime after 2018. However, defendants plan to proceed with some related construction projects in these areas even before traffic reaches 13,000 ADT. For example, WisDOT indicates that it will soon begin

_____

[3]The ROD can be found in volume six of the administrative record, beginning at FHWA 04437.

3

construction on a project involving the County Q intersection, which is located in the fifth phase of the project.[4]

In the present suit, plaintiffs allege that FHWA's decision to approve the expansion project was contrary to NEPA and the Federal Aid Highway Act ("FAHA"), 23 U.S.C. §§ 101 et seq., and that therefore the decision should be set aside pursuant to the APA. Plaintiffs also allege that in furtherance of the project the Corps issued two permits allowing wetlands to be filled in violation of § 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344.

Before plaintiffs filed the present suit, however, plaintiff Citizens filed a lawsuit challenging a related project located just north of the eighth phase of the corridor-expansion project. The related project was known as the "Ackerville Bridge" project. In the prior suit, Citizens argued, among other things, that the defendant agencies were required by law to consider the environmental impacts of the Ackerville Bridge project and the Highway 164 expansion project together as part of the same EIS, rather than segmenting them into two distinct projects and considering their environmental effects separately. The district court sided with the agencies, and the court of appeals affirmed. See Highway J Citizens Group v. Mineta, 349 F.3d 938 (7th Cir. 2003) (hereinafter "Citizens I"). Importantly, in the first lawsuit, Citizens sought to enjoin not only the Ackerville Bridge project, but also the entire Highway 164 expansion. Thus, when Citizens and WEAL filed the present action seeking to enjoin the expansion of Highway 164, defendants argued that plaintiffs' claims were barred by claim preclusion (also known as res judicata).

---

[4]See http://www.dot.wisconsin.gov/projects/d2/wis164stud/schedule.htm (viewed Sept. 14, 2009).

4

Defendants raised the claim preclusion defense in opposition to plaintiffs' motion for a preliminary injunction. I found that because Citizens had raised its claim concerning the Highway 164 expansion in its prior lawsuit, Citizens was precluded from relitigating that claim as part of this lawsuit. However, I noted that plaintiff WEAL was not a plaintiff in the prior lawsuit and questioned whether the judgment in Citizens I also precluded WEAL's claims. Defendants responded that WEAL was in privity with Citizens and therefore was bound by the judgment against Citizens. Although at the hearing on the preliminary injunction motion I questioned whether WEAL was in fact in privity with Citizens, WEAL did not dispute that it was. After the hearing, defendants submitted additional evidence supporting its claim that WEAL and Citizens were privies, and WEAL did not dispute that evidence. Thus, in my decision denying the motion for preliminary injunction, I concluded that WEAL and Citizens were privies and that therefore WEAL's claims were also barred by claim preclusion.

On appeal, WEAL did not dispute that it was in privity with Citizens. See Highway J Citizens Group v. U.S. Dep't of Transp., 456 F.3d 734, 741 (7th Cir. 2006). Rather, it argued that the present litigation and Citizens I did not involve the same cause of action, and that therefore the judgment in Citizens I did not preclude Citizens' claims or its own. Id. The court of appeals determined that both lawsuits involved the same claim and that therefore Citizens I precluded both WEAL and Citizens from pursuing their attack on the March 6, 2002 ROD. Id. at 744.

As stated, plaintiffs then proceeded with the litigation in this court. They concede that Citizens' challenge to the March 6, 2002 ROD is barred by claim preclusion but argue that WEAL and Citizens were not privies and that therefore WEAL's challenge is not

5

barred.  Further, both Citizens and WEAL continue to challenge the Corps's decisions to issue wetland-fill permits for the project.

## II.  PROCEDURAL DEFENSES

### A.    Standing

Defendants first argue that plaintiffs have not established that they have standing to sue.  To show that they have standing to seek injunctive relief, plaintiffs must demonstrate that they are under threat of suffering an injury-in-fact that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.  See, e.g., Summers v. Earth Island Inst., __ U.S. __, 129 S. Ct. 1142, 1149 (2009).  Because plaintiffs are organizations, to establish standing, plaintiffs must show that they each have at least one member that has standing to seek injunctive relief.  Id.

On May 27, 2009, I directed plaintiffs to file affidavits from their individual members indicating that they have suffered, or are threatened with, the requisite injury-in-fact. Plaintiff WEAL submitted affidavits from members Steven D. Schmuki and Allen Stasiewski.  Each member states that he lives in Waukesha County, regularly travels on Highway 164 and derives personal enjoyment from the environmental resources along the Highway 164 corridor.  (Schmuki Aff. ¶ 8; Stasiewski Aff. ¶ 10.)  Each member further states that he seeks an injunction against further work on the corridor-expansion project and directing the dismantling of the completed portions of the project.  (Schmuki Aff. ¶ 9; Stasiewski Aff. ¶ 11.)

6

These affidavits are sufficient to show that WEAL's members have standing. They establish that WEAL's members live near the affected area and regularly enjoy its environmental resources, that defendants' actions have harmed and threaten to do further harm to their recreational and aesthetic enjoyment of the area, and that a ruling from this court prohibiting further work on the project and ordering the dismantling of past work would likely redress their injuries.[5]

Although defendants contend that "[s]imply driving on Highway 164 like hundreds of other travelers is insufficient to show the injury in fact required to prove standing" (Defs.' Resp. to Standing Decls. at 5), this is wrong. "If [harm to the environment] in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice [to satisfy the injury-in-fact requirement]." Summers, 129 S. Ct. at 1149. Further, even though hundreds of others may share the same aesthetic interests as WEAL's members, this does not deprive WEAL of standing. Sierra Club v. Morton, 405 U.S. 727, 734 (1972) ("Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process."). What is important is that WEAL's members actually be among the hundreds of persons who visit or are likely to visit the affected area and thus experience harm to their recreational or aesthetic interests. See

_____

[5]Defendants note that it would be impractical to dismantle the portions of the project that have been completed. However, I could order the dismantling of such phases if I found it appropriate to do so. See Van Abbema v. Fornell, 807 F.2d 633, 636-37 (7th Cir. 1986). Although I may ultimately decide that dismantling the completed phases is not an appropriate remedy, plaintiffs nevertheless have standing to seek it.

Case 2:05-cv-00212-LA   Filed 09/14/09   Page 7 of 48   Document 167

Summers, 129 S. Ct. at 1150 (explaining that member did not have standing where likelihood of member traveling to affected area was highly speculative). Here, WEAL's members have established that they live well within driving distance of the affected area and observe and use it regularly. Accordingly, they have been injured by the corridor-expansion project and the destruction of wetlands and are likely to be injured further if work on the project continues and the existing work is not dismantled.

I next consider whether Citizens' members have standing to challenge the Corps's issuance of the two CWA permits. Citizens has submitted affidavits from members Jeffrey M. Gonyo and Charles N. Petrie designed to establish such standing. Gonyo states that he lives on Highway 164, just north of the northernmost phase of the expansion project, and that the expansion project will harm his recreational and aesthetic enjoyment of the Highway 164 corridor. (Gonyo Aff. ¶¶ 2, 11.) Petrie also lives along Highway 164, and defendants concede that he "lives in the general area of Waukesha County where fill was authorized by [the Corps] and placed by WisDOT under the CWA permits." (Defs.' Resp. to Standing Decls. at 6-7.) Petrie states that the expansion of Highway 164 has harmed him in a number of ways, including by impairing his aesthetic enjoyment of the environment surrounding his home. (Petrie Aff. ¶ 11.)

Neither Gonyo nor Petrie explain how the Corps's decisions to issue the CWA permits caused him harm. Each limits his affidavit to explaining how he was harmed by the entire project. However, Citizens is barred by claim preclusion from challenging the decision to implement the corridor-expansion project itself, as opposed to the CWA permits. I am satisfied, however, that Petrie's affidavit permits me to infer a causal connection between the permits and Petrie's injuries. Because he lives in the immediate

8

area where wetlands were filled pursuant to the permits, at least part of the aesthetic and other harm he describes is fairly traceable to those permits. If I ordered the Corps to revoke the permits and restore the wetlands, Petrie's harm would be redressed, at least to some extent. Thus, since at least one member of Citizens has standing to challenge the permits, I conclude that Citizens itself has such standing.

## B. Mootness

Defendants next argue that because it would be impractical to dismantle the completed phases of the project or restore the wetlands, plaintiffs' challenges to these aspects of the project are moot. However, a case is moot only if it is impossible to grant any form of meaningful relief. A case is not moot if I can grant "any effectual relief whatever." Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992) (internal quotation marks omitted). Thus, even if I cannot return the parties to the status quo ante, if I can fashion some form of meaningful relief, the case is not moot. Id. at 12-13; accord In re Resource Techs. Corp., 430 F.3d 884, 886-87 (7th Cir. 2005); In re UNR Indus., Inc., 20 F.3d 766, 768 (7th Cir. 1994).

In the present case, plaintiffs have undoubtedly suffered irreparable harm as a result of the completed phases of the project. Even if they prevail, I would not be able to return the environment surrounding the completed phases to its pre-construction condition. However, even though it is impossible to make plaintiffs whole, I could still grant them some meaningful relief with respect to the completed phases. As already noted, supra note 5, I could order defendants to dismantle the completed phases, convert the highway back to a two-lane highway, and to the extent possible, restore the surrounding environment. Van Ambbema v. Fornell, 807 F.2d 633, 636-37 (7th Cir. 1986) (noting that

9

court has power to order that facility be dismantled if decision to construct facility did not comply with NEPA). Likewise, I could order the Corps to revoke the permits that allowed WisDOT to fill the wetlands, and the Corps could then decide to require WisDOT to restore the land to its original condition. Cf. United States v. Bailey, 516 F. Supp. 2d 998, 1001 (D. Minn. 2007) (stating that Corps can order person who filled wetland without a permit to restore land to pre-violation condition). Again, it likely will be impossible to completely restore the environment to its pre-construction condition, but it may be possible to partially restore it and to partially remediate plaintiffs' injuries. At the least, I could order defendants to take steps to minimize or offset the environmental damage. See Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 165-66 (9th Cir. 2002) (holding that challenge to logging project was not moot even though logging was complete because court could order that agency adopt mitigation measures).

Defendants correctly note that except in rare cases the proper remedy in an APA action is to remand the matter to the agency for further investigation or explanation, see Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985), and that therefore it is unlikely that I will issue an injunction with respect to the completed phases. However, the present case may turn out to be one of the rare cases in which injunctive relief is appropriate. It is also possible that if I vacate the March 6, 2002 ROD and CWA permits and remand the case to the respective agencies, the agencies will on further deliberation decide to dismantle the completed phases of the project or employ one of the other remedies discussed above.

Whether the court or the agencies will in fact choose any of these remedies is irrelevant. The relevant question is whether effective relief remains possible, not whether

10

it is likely to be awarded.  In re UNR Indus., Inc., 20 F.3d at 768 (holding that court's "raw ability" to grant effective relief is enough to prevent mootness; whether court should grant such relief is a different matter unrelated to mootness).  Because effective relief remains possible, plaintiffs' claims are not moot.

**C.  Ripeness**

Defendants next argue that because the remaining phases of the Highway 164 expansion project are not likely to be implemented until 2018, if at all, WEAL's challenge to those phases is not ripe.  "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  Nat'l Park Hospitality Ass'n v. Dep't of the Interior, 538 U.S. 803, 807-08 (2003) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967)).

The problem with defendants' ripeness argument is that WEAL does not challenge any particular phase of the project.  Rather, it challenges defendants' decision to implement the entire corridor-expansion project, a decision that defendants have formalized in the March 6, 2002 ROD.  (ROD at 1 (approving the "18-mile (29-km) County J/WIS 164 project").)  Indeed, as defendants demonstrated at the preliminary injunction stage, the APA limits plaintiffs to challenging the final agency decision as embodied in the ROD, and it is impossible to separate the ROD into sub-parts for litigation purposes.  See Highway J Citizens Group, 456 F.3d at 743 (explaining that all NEPA issues in the present case derive from a single factual transaction: "the preparation and finalization of the

11

Highway 164 EIS"). Therefore, to obtain redress for the concrete harm its members have suffered and continue to suffer as a result of the completed phases of the project, WEAL has no option but to challenge the ROD approving the entire project. WEAL's challenge to the ROD is thus ripe for review.

### D.    Claim Preclusion

The next issue is whether WEAL is in privity with Citizens and therefore precluded from challenging the March 6, 2002 ROD. As noted, defendants at the preliminary injunction stage argued that both Citizens and WEAL were precluded from challenging the ROD based on Citizens' earlier challenge to the Ackerville Bridge project. At the preliminary inunction hearing, I noted that WEAL was not a party to the prior litigation and that therefore it seemed as though WEAL should not be precluded from challenging the ROD. Defendants responded by arguing that Citizens "virtually represented" WEAL in the prior litigation and submitted evidence in support of this contention. WEAL did not make any arguments on the issue. When I denied plaintiffs' request for a preliminary injunction, I stated that WEAL had no likelihood of success on its NEPA and FAHA claims because it was likely that it and Citizens were privies and that therefore WEAL was precluded from challenging the March 6, 2002 ROD. However, my preliminary finding of privity did not depend on the doctrine of virtual representation but on my reading of Seventh Circuit caselaw rejecting the doctrine. See, e.g., In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig., 333 F.3d 763, 769 (7th Cir. 2003); Perry v. Globe Auto Recycling, Inc., 227 F.3d 950, 953 (2000). Instead of applying the doctrine of virtual representation, I applied a test that focused "on the general question whether the earlier parties were in some sense proper agents for the later parties," Tice v. Am. Airlines, Inc., 162 F.3d 966, 971 (7th Cir.

12

1998), and concluded that because in <u>Citizens I</u> WEAL offered moral support to Citizens and made a contribution toward its legal fees, it was likely that Citizens was in some sense a proper agent for WEAL in that litigation. WEAL did not challenge this conclusion on appeal. <u>Highway J Citizens Group</u>, 456 F.3d at 741 ("Nor do [plaintiffs] dispute that, although WEAL was not a named plaintiff in the prior litigation, WEAL and Citizens are in privity.").

After the court of appeals affirmed my decision, the Supreme Court decided a case in which it rejected the doctrine of virtual representation. <u>Taylor v. Sturgell</u>, __ U.S. __, 128 S. Ct. 2161, 2167 (2008). The Court held that, in general, a nonparty to prior litigation is precluded by a judgment resulting from such litigation only if the case falls into one of six categories: (1) the nonparty to the previous litigation agreed to be bound by the judgment, such as where all potential litigants agree that one case will serve as a "test case"; (2) the nonparty and the party to the previous litigation had a pre-existing substantive legal relationship, such as successive owners of property, bailee and bailor, and assignee and assignor; (3) the nonparty was "adequately represented" by a party to the prior litigation, such as in class actions and suits by trustees, guardians and other fiduciaries; (4) the nonparty assumed control over the prior litigation; (5) the party to the previous litigation is attempting relitigation through a proxy – that is, the nonparty brings the successive suit as the "designated representative" of the party to the prior suit; and (6) where a special statutory scheme expressly and validly forecloses successive litigation by nonparties, as in bankruptcy, probate and <u>quo warranto</u> proceedings. <u>Id.</u> at 2172-73. The Court found that the doctrine of virtual representation did not fall within any of these categories and was

13

not, therefore, a valid basis for applying a judgment preclusively against a nonparty to the litigation resulting in the judgment. Id. at 2173-78.

WEAL now argues that it was not in privity with Citizens because its relationship with Citizens does not fall within any of the six categories of nonparty preclusion identified in Taylor. Initially, I note that Taylor recognized that the Seventh Circuit had correctly rejected the doctrine of virtual representation. Id. at 2170 n.3 (citing Perry, 227 F.3d at 953). Thus, it did not change the basic principles of Seventh Circuit privity law. Nevertheless, Taylor abrogated the test that I applied at the preliminary injunction stage of the case. As stated, I asked whether "Citizens was in some sense a proper agent for WEAL." (Order at 15.) I explained that this test was imprecise and "fact-specific." (Id. at 14.) In Taylor, however, the Court rejected a conception of privity based solely on "identity of interests and some kind of relationship between parties and nonparties." 128 S. Ct. at 2176. It rejected the argument that a nonparty is precluded from litigating a matter when its relationship with a party in the prior litigation was "close enough." Id. at 2174-75. It likewise rejected an "all-things-considered balancing approach" that "might spark wide-ranging, time-consuming, and expensive discovery." Id. It held that preclusion must be based on "crisp rules with sharp corners" rather than "a round-about doctrine of opaque standards." Id. at 2177 (internal quotation marks omitted).

The test that I applied at the preliminary injunction stage – whether a party to prior litigation was "in some sense a proper agent" for a nonparty – was not a crisp rule with sharp corners but rather a somewhat opaque standard that relied on an all-things-considered balancing approach. Indeed, the question I asked could easily be rephrased as whether the relationship between Citizens and WEAL was "close enough" to bring

14

WEAL within the judgment in <u>Citizens I</u>. Because the Supreme Court rejected the standard I applied, my prior ruling is inconsistent with current law.

Defendants argue that, even if my prior ruling is inconsistent with current law, WEAL cannot reopen the privity issue because I resolved it at the preliminary injunction stage and therefore the doctrines of law of the case and waiver apply. However, neither law of the case nor waiver can be appropriately applied to the circumstances present here. I start with law of the case, which "posits that when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case." <u>Equal Employment Opportunity Comm'n v. Sears, Roebuck & Co.</u>, 417 F.3d 789, 796 (7th Cir. 2005) (internal quotation marks and emphasis removed). As a general rule, however, decisions on preliminary injunctions do not constitute law of the case, and the parties are free to litigate the merits during later phases. <u>University of Texas v. Camenisch</u>, 451 U.S. 390, 395 (1981); <u>Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wisconsin, Inc.</u>, 991 F.2d 1249, 1258 (7th Cir. 1993); <u>In re Oil Spill by the Amoco Cadiz</u>, 954 F.2d 1279, 1292 (7th Cir. 1992); <u>Hunter v. Atchison, T. & S.F. Ry. Co.</u>, 188 F.2d 294, 298-99 (7th Cir. 1951); <u>accord</u> <u>Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.</u>, 499 F.3d 1108, 1114 (9th Cir. 2007). This is so because:

> [t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. <u>A party thus is not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.</u>

15

University of Texas, 451 U.S. at 395 (citations omitted, emphasis added). In fact, the Seventh Circuit has "advised district courts to be cautious in adopting conclusions of law made in ruling on a preliminary injunction because the posture of the case at that time inevitably entails incomplete evidentiary materials and hurried consideration of the issues." Lac du Flambeau, 991 F.2d at 1258. Thus, as a general rule, WEAL is not precluded from revisiting my previous conclusion that it was in privity with Citizens. Indeed, because I reached that conclusion at the preliminary injunction stage, it was only a prediction that WEAL was in privity with Citizens, rather than a final adjudication of the issue. (See also Prelim. Inj. Order at 32 (inviting WEAL to develop factual record concerning privity in later stages of case).)

One exception to the general rule that rulings made at a preliminary injunction stage are not law of the case is that rulings on "pure issues of law" are binding in subsequent stages. E.g., Ranchers Cattlemen, 499 F.3d at 1114. However, my conclusion that WEAL and Citizens were privies was not a conclusion regarding a pure issue of law; rather, I reached it by applying the law to the facts of the case (which had yet to be fully developed).

If my interpretation of the legal standards governing privity were severed from the facts, it could be described as a conclusion regarding a pure issue of law. However, if it were so described and regarded as law of the case, then there is a compelling reason to reopen the issue. The law of the case doctrine permits a court to revisit an issue "if there is a compelling reason, such as a change in, or clarification of, law that makes clear that the earlier ruling was erroneous." Santamarina v. Sears, Roebuck & Co., 466 F.3d 570, 572 (7th Cir. 2006); accord United States v. Harris, 531 F.3d 507, 513 (7th Cir. 2008). In the present case, the compelling reason is the Supreme Court's decision in Taylor.

16

Although Taylor did not change Seventh Circuit law regarding virtual representation, it clarified the law of nonparty preclusion by synthesizing Supreme Court caselaw on the subject and identifying six categories in which courts should apply preclusion. Taylor made clear that to bring a nonparty within a judgment, it is not enough for the relationship between the party to the prior litigation and the nonparty to be "close enough"; rather, the party must have understood itself to be acting as the nonparty's representative or the court must have taken steps to protect the nonparty's interests, as in a class action. 128 S. Ct. at 2174-75.

Revisiting the test that I applied based on the Seventh Circuit's opinion in Tice after reading Taylor makes clear that I read too much into the following language from Tice:

> In addition, unless some formal kind of successor in interest is involved . . . , there should be some indication not only that the second party was aware that the first litigation was going on and that the earlier litigation would resolve its claims, but also that the second party either had participated or had a legal duty to participate. Finally, of course, the due process rights of absentees . . . must be respected.

Tice, 162 F.3d at 973 (emphasis added). I understood the phrase "some indication [that the nonparty] had participated" in the prior action to require a fairly loose connection between the party and the nonparty, and I concluded that WEAL's moral support of and financial contribution to Citizens in Citizens I was "some indication" that WEAL "had participated" in the prior case. However, reading this phrase in light of Taylor, I realize that it requires a tighter and more formal relationship between a party and nonparty before claim preclusion may be applied. In other words, if a nonparty is to be bound by a prior judgment, "some indication" of its participation in the prior action is not enough. Indeed, Taylor suggests that only a relationship giving rise to a fiduciary duty will result in nonparty

17

preclusion based on the party's purported representation of the nonparty. 128 S. Ct. at 2172-73. Applying this standard, it is clear that WEAL's moral support and financial contribution in <u>Citizens I</u> should not have resulted in preclusion because Citizens did not regard itself as WEAL's agent or as owing WEAL a fiduciary duty in exchange for its support. But prior to <u>Taylor</u>, this was not clear, and even if WEAL had challenged my privity finding on appeal, the court of appeals might well have read <u>Tice</u> as broadly as I did. Thus, although <u>Taylor</u> did not change the law, it clarified it, making clear that my earlier ruling was erroneous. Thus, even if my interpretation of the law of privity could be regarded as the law of the case, a compelling reason exists for revisiting the issue.

Defendants next argue that WEAL waived its right to contest that it was in privity with Citizens by not raising the issue at the preliminary injunction stage or on appeal from the denial of the preliminary injunction. Waiver is the intentional relinquishment of a known right, <u>see, e.g.</u>, <u>United States v. Farmer</u>, 543 F.3d 363, 371 (7th Cir. 2008), and such intent may be found only when the party expressly waives the right or engages in "conduct inconsistent with an intent to enforce that right," <u>J.H. Cohn & Co. v. Am. Appraisal Accocs., Inc.</u>, 628 F.2d 994, 1000 (7th Cir. 1980). In the present case, WEAL did not expressly waive its argument that it was not in privity with Citizens. At most, it implicitly did so by failing to raise it at the preliminary injunction stage or during the interlocutory appeal. However, failing to raise an argument at the preliminary injunction stage is not inconsistent with an intent to pursue the argument during later stages of a case. As noted, a party is "not required to prove his case in full at a preliminary-injunction hearing."[6] <u>University of</u>

---

[6]Of course, if pursuant to Fed. R. Civ. P. 65(a)(2) a trial court consolidates the hearing on the preliminary injunction with the trial on the merits, a party must present its

18

<u>Texas</u>, 451 U.S. at 395. And in the present case, I expressly invited WEAL to develop the record concerning privity during later stages of the case. (Prelim. Inj. Order at 32.) WEAL could have decided to focus its preliminary injunction presentation on its contention that <u>Citizens I</u> and the present case did not involve the same claims and to subsequently develop the record concerning privity. As indicated by the Supreme Court, a preliminary injunction proceeding is often a hurried affair (the proceeding here was no exception) at which parties reasonably focus on what they consider their best arguments.[7] For these reasons, I cannot say that by not arguing privity at the preliminary injunction stage, WEAL engaged in conduct inconsistent with an intent to argue privity. Thus, WEAL did not waive its privity argument.

Turning to the merits of the privity issue, defendants argue that WEAL is in privity with Citizens based on the third and fifth categories of nonparty preclusion identified in <u>Taylor</u>. I begin with the fifth category, under which a nonparty can be precluded if it acts as a "proxy" for a party to the prior litigation. 128 S. Ct. at 2173. Under this category, "preclusion is appropriate when a nonparty later brings suit as an agent for a party who is bound by a judgment." <u>Id.</u> The Supreme Court has instructed that "courts should be cautious about finding preclusion on this basis," and that "a mere whiff of 'tactical

_____

case in full at the preliminary injunction stage. However, in this case I did not consolidate the hearing with the trial.

[7]Although WEAL had more time to develop its arguments on appeal, it would not have been permitted to raise arguments not raised in the district court, <u>see, e.g.</u>, <u>Coronado v. Valleyview Pub. Sch. Dist.</u>, 537 F.3d 791, 797 (7th Cir. 2008), and even if it could have argued privity on appeal, it would not have been able to develop the factual record, <u>see, e.g.</u>, <u>e360 Insight v. The Spamhaus Project</u>, 500 F.3d 594, 601 (7th Cir. 2007) (court of appeals is forum for resolving issues of law, not fact).

19

maneuvering' will not suffice." Id. at 2179. Instead, "principles of agency law are suggestive," and "[t]hey indicate that preclusion is appropriate only if the putative agent's conduct of the suit is subject to the control of the party who is bound by the prior adjudication." Id. In the present case, there is no evidence that WEAL is controlled by Citizens. There is no indication, for example, that Citizens dictates WEAL's litigation strategy or that it can direct WEAL to pursue or abandon claims. Although WEAL and Citizens have the same attorney, this is not uncommon in multiparty litigation, and it does not support an inference that one party controls the other. Thus, the present case presents no more than a whiff of tactical maneuvering, and therefore the fifth category of nonparty preclusion does not apply.

Under the third category, a nonparty may be bound by a judgment if it was "adequately represented" by a party that had the same interests. Id. at 2172-73. This category includes properly conducted class actions and suits brought by trustees, guardians and other fiduciaries. Id. The Court stated that "[a] party's representation of a nonparty is 'adequate' for preclusion purposes only if, at a minimum: (1) the interests of the nonparty and her representative are aligned; and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." Id. at 2176 (citation omitted). In the present case, the first of these elements is met. The interests of Citizens and WEAL in Citizens I were aligned, inasmuch as both groups sought to invalidate the March 6, 2002 ROD and halt the expansion of Highway 164. (See also Preliminary Inj. Order at 16 (explaining that WEAL and Citizens have identical interests in the present suit and had identical interests in Citizens I).) However, the second element is not satisfied because there is no indication

20

that Citizens understood itself to have been acting as WEAL's representative in <u>Citizens</u> <u>I</u>, or that the court in <u>Citizens I</u> took care to protect WEAL's interests. As noted, there is evidence that WEAL supported Citizens' efforts in <u>Citizens I</u> and that it donated a small amount of money (about $450) towards Citizens' legal fees. But offering moral and modest financial support to a litigant does not make the litigant the nonparty's formal representative or fiduciary. And there is no evidence that WEAL's donation caused Citizens to view itself as WEAL's representative or as owing WEAL a fiduciary duty. There is no indication, for example, that Citizens had to consult WEAL about its litigation strategy or obtain WEAL's consent before abandoning claims or entering into a settlement agreement. Thus, although Citizens was "in some sense" a proper agent for WEAL in <u>Citizens I</u>, it was not WEAL's agent in a formal sense such that it had a fiduciary duty to protect WEAL's interests. Therefore, Citizens was not an adequate representative of WEAL.

Accordingly, I conclude that WEAL and Citizens are not privies and that WEAL is not bound by the judgment in <u>Citizens I</u>.

## III. NEPA

### A.    Standard of Review

When a plaintiff challenges an agency's decision under the APA based on the agency's failure to comply with NEPA, the standard of judicial review is narrow. <u>Citizens</u> <u>I</u>, 349 F.3d at 952. The court does not consider whether the agency made the "right" decision, but only whether, in making its decision, it followed the procedures prescribed by NEPA. <u>Id.</u> (NEPA "'does not mandate particular results, but simply prescribes the necessary process.'") In the present case, WEAL argues that the FHWA did not comply

with the procedures required by NEPA because it did not prepare a satisfactory EIS before approving the Highway 164 expansion project.

As noted, NEPA requires that federal agencies prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS is "a detailed analysis and study conducted to determine if, or the extent to which, a particular agency action will impact the environment." Citizens I, 349 F.3d at 953. Requiring an agency to prepare an EIS serves two purposes. First, "'[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts.'" Dep't of Transp. v. Public Citizen, 541 U.S. 752, 768 (2004) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989)) (alteration in original). Second, "it 'guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.'" Id. Thus, the agency must "articulate why [it has] settled upon a particular plan and what environmental harms (or benefits) [its] choice entails." Simmons v. U.S. Army Corps of Eng'rs, 120 F.3d 664, 666 (7th Cir. 1997). The EIS must show that agency officials have "[thought] through the consequences of – and alternatives to – their contemplated acts," and must ensure that "citizens get a chance to hear and consider the rationales the officials offer." Id. Stated differently, the agency must demonstrate that it "has taken a 'hard look' at environmental consequences." Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976).

In recent decisions, I have tried to identify the principles that a court must apply when determining whether an EIS satisfies NEPA. See Habitat Educ. Ctr. v. U.S. Forest Service, 603 F. Supp. 2d 1176, 1182-84 (E.D. Wis. 2009); Habitat Educ. Ctr. v. U.S. Forest

22

Service, 593 F. Supp. 2d 1019, 1024-26 (E.D. Wis. 2009). As noted, the Supreme Court and Seventh Circuit have stated that "the only role for a court [in the NEPA context] is to insure that the agency has taken a 'hard look' at environmental consequences." Kleppe, 427 U.S. at 410 n.21; Environmental Law & Policy Ctr. v. U.S. Nuclear Regulatory Comm'n, 470 F.3d 676, 682 (7th Cir. 2006); Citizens I, 349 F.3d at 953. However, "[w]hat constitutes a 'hard look' cannot be outlined with rule-like precision," Nat'l Audubon Soc'y v. Dep't of the Navy, 422 F.3d 174, 185 (4th Cir. 2005), and it is a standard that "is not susceptible to refined calibration," Churchill County v. Norton, 276 F.3d 1060, 1071 (9th Cir. 2001) (internal quotation marks and citation omitted). Rather than apply a rigid standard, a court must make a "pragmatic judgment" as to whether the agency has fostered the two principal purposes of an EIS: informed decisionmaking and informed public participation. Id.

In making its pragmatic judgment, a court must be careful not to "'flyspeck' an agency's environmental analysis, looking for any deficiency, no matter how minor." Nat'l Audubon Soc'y, 422 F.3d at 186. With a document as complicated and mired in technical detail as an EIS, it will always be possible to point out some potential defect or shortcoming, or to suggest some additional step that the agency could have taken to improve its environmental analysis. An EIS is unlikely to be perfect, and setting aside an EIS based on minor flaws that have little or no impact on informed decisionmaking or informed public participation would defy common sense. Thus, rather than getting bogged down in possible technical flaws, a court must "take a holistic view of what the agency has done to assess environmental impact." Id. Further, courts must remember that it is the agency, and not the court, that has the technical expertise required to perform the

23

environmental analysis in the first place. This means that judicial review of an EIS must be deferential, especially when it comes to the scientific and technical details that make up the heart of the analysis. Citizens for Alternatives to Radioactive Dumping v. Dep't of Energy, 485 F.3d 1091, 1098 (10th Cir. 2007) (judicial deference is "especially strong" where decision involves technical or scientific matters within agency's area of expertise). Of course, deferential review does not mean no review, and courts must ensure that agencies carry out their duties under NEPA, make reasoned choices, and provide a discussion that fully and frankly explains the environmental consequences of a proposed action. However, to strike a proper balance between deference and a "searching and careful" inquiry, Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989), a court may invalidate an EIS only if, after first learning what is going on so that it does not decide on the basis of superficial beliefs and assumptions, the court is firmly convinced that an error or omission in the EIS has defeated the goals of informed decisionmaking and informed public participation. Cf. Eagle Foundation, Inc. v. Dole, 813 F.2d 798, 803 (7th Cir. 1987). Again, this standard of review is not precise, but requires that the court exercise good judgment.[8]

---

[8]Some courts have described this standard as a "rule of reason," under which the court asks "whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." See, e.g., Churchill County, 276 F.3d at 1071 (internal quotation marks and citation omitted); see also Ecology Ctr., Inc. v. United States Forest Service, 451 F.3d 1183, 1189-90 (10th Cir. 2006) ("We apply a rule of reason standard (essentially an abuse of discretion standard) in deciding whether claimed deficiencies in a [final] EIS are merely flyspecks, or are significant enough to defeat the goals of informed decision making and informed public comment.").

Case 2:05-cv-00212-LA   Filed 09/14/09   Page 24 of 48   Document 167

**B.    Discussion of Indirect Effects.**

An EIS must include a discussion of indirect effects and their significance.  40 C.F.R. § 1502.16(b).  Council on Environmental Quality ("CEQ")[9] regulations define indirect effects as those that are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  40 C.F.R. § 1508.8(b).  Indirect effects "include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems."  Id.

In the present case, defendants examined the indirect effects of the expansion project by considering whether the project would affect growth within one mile on each side of the Highway 164 corridor.  FEIS at 4-3.  Defendants used regional and local land-use plans to identify the growth that planners had anticipated before the decision to expand the corridor to four lanes was made.  Id.  Defendants then asked whether expanding the corridor to four lanes would substantially change the anticipated growth.  Id.  Defendants also asked five local governments to participate in a mail survey that sought their input on issues relating to land use and development.  Id. at 4-4 to 4-8.  Four of the governments responded, and the survey results are summarized in the EIS.  Id.  After summarizing the survey results, the EIS states that based on the information provided by the local governments "it is concluded that a future 4-lane highway will not substantially influence

_____

[9]NEPA established CEQ as an agency within the Executive Office of the President. It  "coordinates federal environmental efforts and works closely with agencies and other White House offices in the development of environmental policies and initiatives."  See http://www.whitehouse.gov/ceq/aboutceq.html (viewed Sept. 14, 2009).

the type, intensity, or location of development over what is already planned for and expected to occur with or without improvements to County J/WIS 164." Id. at 4-8.

The problem with defendants' discussion is that it is not a discussion but simply a summary of land use plans and survey responses followed by a bare conclusion. The EIS does not include even one sentence explaining how defendants reached the conclusion that expanding Highway 164 would not substantially influence growth. Defendants do not explain how they interpreted the regional and local land use plans, and thus it is not clear why defendants thought that such plans indicated that the same amount of growth would occur whether or not Highway 164 was expanded. Nor can defendants' conclusion be reasonably inferred from the survey responses. Only four municipalities responded to the survey, and two of the four stated that an expansion to four lanes would likely increase the intensity of development over that which they had planned for. FEIS, Table 4.1. I simply cannot understand how defendants reached the conclusion that the expansion would not substantially influence development when fifty percent of survey respondents anticipated that it would.

At oral argument, defendants' counsel agreed that the discussion of indirect effects in the EIS was conclusory but suggested that the agency conducted a more complete analysis but did not include it in the EIS. (Tr. at 33-35.) However, to promote informed public participation and informed decisionmaking, the agency must disclose its analysis in the EIS itself and not keep it private within the agency. 40 C.F.R. § 1502.16(b) (requiring that EIS "include discussions of . . . [i]ndirect effects and their significance"); Vill. of False Pass v. Watt, 565 F. Supp. 1123, 1141 (D. Alaska 1983) ("The adequacy of the

26

environmental impact statement itself is to be judged solely by the information contained in that document."). In any event, defendants do not point to any document in the administrative record that contains any indication that defendants performed a more thorough analysis than that which appears in the EIS. Therefore, I find that defendants' treatment of indirect effects was inadequate and that the EIS must be revised to include an explanation of the reasoning that led defendants to conclude that the expansion would not substantially influence development.

I add that defendants' conclusion is extremely counterintuitive. One need not be an expert to reasonably suspect that if Highway 164 were not expanded development in the region would be constricted. Presumably, congestion on a two-lane Highway 164 would discourage development in the area, whereas expansion of the highway to four lanes would cause development to continue unabated.[10] Thus, as discussed in more detail below in the context of cumulative impacts, the EIS cannot simply assume that development will occur at the same pace whether or not defendants yield to the demand for more roads. See also N. Carolina Alliance for Transp. Reform, Inc. v. U.S. Dep't of Transp., 151 F. Supp. 2d 661, 696-97 (M.D.N.C. 2001) (finding discussion of indirect effects inadequate because agency's assumption that project would have no effect on future growth in the area "defies common sense"). The expansion appears to be an event

---

[10]A related problem is that of "induced traffic" – that is, additional traffic resulting from motorists' decisions to take advantage of additional highway lanes. Expanding road capacity may cause induced traffic because the increased capacity makes driving less burdensome, and as a result, motorists who otherwise would not have used the roads decide to make additional or longer trips. See Andres Duany et al., Suburban Nation: The Rise of Sprawl and the Decline of the American Dream 89-90 (2000).

27

that would itself contribute to growth in the region, and if on remand defendants adhere to their conclusion that it is not, they must cite data and reasoning supporting their conclusion.[11]  If after reasonable effort defendants find that they cannot determine the effect of the expansion on development, they must demonstrate that they complied with the CEQ regulation prescribing an agency's duties in the face of incomplete or unavailable information, 40 C.F.R. § 1502.22.

## C.    Discussion of Cumulative Impacts.

Regulations promulgated by the CEQ require that an EIS include a discussion of environmental impacts, including impacts that are direct, indirect and cumulative.  40 C.F.R. § 1508.25.  "Cumulative impact" is:

> the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.  A proper cumulative impacts analysis will assess the proposed action in light of other activity that has affected or will affect the same environmental resources. The goal is to highlight any environmental degradation that might occur if the minor effects of multiple actions accumulate over time.  For example, although a single highway-

---

[11]It is no answer to say that the expansion project is intended to "serve" existing and future development rather than to "drive" it.  See FEIS at 9-9.  Whatever defendants' intent may be, the fact remains that "serving" development fosters more development, and some of that development (and its consequent environmental impacts) might not occur if Highway 164 remained a two-lane highway.  Defendants must try to identify the extent to which the expansion will affect future development and cannot simply assume that the level of development will be the same no matter what they do.

28

improvement project might have minimal environmental consequences, combining that project with those that preceded it and others that are anticipated might reveal a more serious overall impact. Placing the project into a broader context that includes these recent and anticipated projects helps prevent "the tyranny of small decisions." Council on Environmental Quality, Considering Cumulative Effects Under the National Environmental Policy Act 1 (January 1997) available at http://ceq.hss.doe.gov/nepa/ccenepa/ccenepa.htm (viewed Sept. 14, 2009).

In the present case, the EIS includes a section discussing cumulative impacts to wetlands, surface water, agricultural lands and upland woods. FEIS at 4-8 to 4-13. The discussion begins by noting that the Highway 164 expansion, "other actions in the general project area and beyond," and "past impacts" have and will continue to impact these resources. FEIS at 4-9. The EIS then discusses each individual resource and notes that each resource has been and will continue to be harmed by urbanization. FEIS at 4-9 ("the past trend of wetland losses will continue as Waukesha County continues to urbanize"); id. at 4-11 ("[w]ith the predicted increase in urban uses in Waukesha and Washington Counties," surface water quality may be reduced); id. at 4-12 ("residential/commercial growth and resulting transportation improvements will continue to convert farmland to other uses"); id. at 4-13 ("[t]ransportation improvements and future development . . . will continue to affect upland woods").

What is missing from the EIS is a meaningful discussion of how the agency's decision regarding the Highway 164 project fits into the overall cumulative impact to these resources. The fundamental flaw is that the EIS simply assumes (with no supporting

analysis) that the area will continue to urbanize whether or not new highways are built. Having assumed that the area will continue to urbanize with or without new roads, the EIS acknowledges that this project and others will continue to harm resources, but it essentially advises that, given the existing trend towards urbanization, the environmental harm will come to pass no matter what decision the agency makes. This discussion does little to assist informed decisionmaking or informed public participation because it does not discuss whether, or the extent to which, the agency's decision is likely to contribute to the problems associated with urbanization and suburban sprawl.

The CEQ's memorandum concerning cumulative-impacts analyses confirms that the discussion in the EIS is inadequate. The memorandum explains that the point of studying cumulative impacts is not simply to identify such impacts, but to inject their consideration "into the planning process as early as needed to improve decisions." CEQ, supra, at 3 (emphasis added). In order to improve decisionmaking, the EIS must explain the cause-and-effect relationship between human activities (including the agency's activities) and the cumulative impact to environmental resources. Id. at 38-41. In this regard, CEQ advises agencies to develop a "conceptual model of cause and effect" to assist in identifying the effects of human action. Id. at 38. Once it has developed a cause-and-effect model, the agency must attempt to fit past actions, present actions, the proposed action, and future actions into the model. Id. at 41-45. But the agency cannot simply lump all actions together and explain that they will have a given cumulative effect. Rather, the agency must "separat[e] [the] effects into those attributable to the proposed action or a reasonable

30

alternative versus those attributable to past and future actions." <u>Id.</u> at 43. This is perhaps best illustrated with an example provided in the CEQ memorandum (p. 43):

| Table 4-1. Example table using quantitative description of effects (within a given level of uncertainty) on various resources | | | | | |
|---|---|---|---|---|---|
| Resource | Past Actions | Present Actions | Proposed Action | Future Actions | Cumulative Effect |
| Air Quality | No effect on $SO_2$ | 20% increase in $SO_2$ | 10% increase in $SO_2$ | 5% increase in $SO_2$ | 35% increase in $SO_2$ |
| Fish | 50% of 1950 population lost | 2% of fish population lost | 5% increase in fish population | 1% of fish population lost | 48% of 1950 fish population lost |
| Wetlands | 78% of presettlement wetlands lost | 1% of existing wetlands lost annually for 5 years | 0.5% of existing wetlands lost | 1.5% of existing wetlands lost annually for 10 years | 95% of presettlement wetlands lost in 10 years |

When the effects are separated in this way, the decisionmaker will be able to determine the "incremental contribution" of his or her decision to the overall cumulative effect. <u>Id.</u>

In the present case, the cumulative-impacts analysis falters by starting the cause-and-effect pathway at urbanization. Although the EIS notes that the trend towards urbanization will likely impact the region's resources, it makes no attempt to determine the causes of urbanization itself. One need not be an expert in traffic engineering or land-use planning to recognize that road building is a potential cause of urbanization.[12] Indeed, the

---

[12]<u>See</u> Douglas S. Kelbaugh, <u>Repairing the American Metropolis</u> 22-26 (2002) (discussing the connection between automobiles and urban sprawl);H.V. Savitch, <u>Encourage, Then Cope: Washington and the Sprawl Machine</u>, <u>in</u> <u>Urban Sprawl: Causes, Consequences & Policy Responses</u> 141, 152 (Gregory D. Squires ed., 2002) ("Highways and automobiles make sprawl possible, probable, and desirable. The very character of highways means that transportation patterns can be fluid. Automobiles expand the uses for land, making settlement patterns more explosive – almost randomly apportioned by points along fluid highway corridors."); Duany et al., <u>supra</u> note 10, at 85 (noting that "settlement patterns depend more than anything else upon transportation systems"); <u>id.</u> at

31

EIS at times seems to acknowledge this fact. See, e.g., FEIS at 4-13 (noting that "transportation improvements" will affect upland woods). However, besides these occasional acknowledgments, the EIS makes no attempt to assess the incremental impact of road building on urbanization and its associated ill effects. It makes no attempt to explain how the agency's decision, when combined with other past, present and future decisions, might influence development in the region. This defect is particularly egregious because many of the present and future decisions affecting traffic in the region are likely to be made by the same agencies that are responsible for the present decision – WisDOT and the FHWA. Thus, unlike many situations, in which the majority of human activities resulting in cumulative impacts are beyond the agency's power to prevent, here we have a scenario in which the agency, through a series of decisions, might be able to exert significant control over the cumulative environmental impact. It is therefore particularly important to identify whether the agency's cumulative decisions regarding highways contribute to urbanization or whether, as the EIS presently assumes, urbanization will occur regardless of what the agency does.

Accordingly, defendants must study and, to the extent possible, quantify the contribution of past, present and reasonably foreseeable future transportation projects to urbanization and its associated effects. Defendants cannot simply assume that urbanization will occur with or without new or expanded highways. Moreover, defendants must attempt to separate effects into those attributable to the proposed expansion of

---

93 (stating that new and expanded roadways make possible new subdivisions, shopping malls, and office parks).

Highway 164 (or a reasonable alternative) and those attributable to past and future transportation projects and other sources of urbanization so that the incremental effect of the Highway 164 project can be seen in light of the overall cumulative effect. CEQ, supra, at 43. Such an analysis is crucial to informed decisionmaking and informed public participation.

Finally, I recognize that defendants may find it difficult to identify all potential causes of urbanization and to quantify the precise contribution of any particular highway project. However, to the extent a complete analysis is not feasible, defendants must thoroughly explain their attempts to identify and quantify the relevant effects and be prepared to demonstrate that they complied with the CEQ regulation prescribing an agency's duties in the face of incomplete or unavailable information, 40 C.F.R. § 1502.22.

**D.    Consideration of Reasonable Alternatives.**

An EIS must discuss alternatives to a proposed action. 42 U.S.C. § 4332(c)(iii). The CEQ regulations specify that the agency preparing an EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). WEAL argues that defendants arbitrarily eliminated from detailed study an alternative that would have been less environmentally destructive than the expansion of Highway 164. The EIS refers to this alternative as the "County Y Corridor" alternative.[13] (FEIS at 2-15.)

_____

[13]WEAL also argues that defendants arbitrarily eliminated from detailed study a variation on the County Y Corridor alternative known as the County V variation. However, because the County Y alternative and County V variation are closely related and none of

33

The County Y alternative was one of a number of so-called "off-alignment alternatives," which were designed to use existing roads other than Highway 164 to divert traffic, thereby reducing traffic demand on Highway 164 and eliminating the need to expand it to four lanes. <u>See</u> FEIS at 2-4, & Exs. 2-5, 2-6 & 2-8. Defendants constructed a traffic model of one of the off-alignment alternatives, known as the "Power Corridor" alternative, FEIS at 2-13 to 2-15, & Ex. 2-6, and the model revealed that this alternative would not have diverted enough traffic away form Highway 164 to eliminate the need to expand Highway 164 to four lanes. FEIS at 2-14. For this reason, among others, defendants eliminated the Power Corridor alternative from detailed study.

Defendants then reviewed the County Y alternative and found that because it was not substantially different from the Power Corridor alternative, it likewise would not have diverted enough traffic to make the expansion of Highway 164 unnecessary. FEIS at 2-15. Defendants stated that the County Y alternative would have diverted even less traffic than the Power Corridor alternative because the Power Corridor alternative would have resulted in less conflicts with local traffic and therefore would have been a more efficient option for drivers than the County Y alternative. <u>Id.</u> Based on this review, defendants concluded that the County Y alternative did not warrant further study.

WEAL argues that because the County Y alternative was less environmentally destructive than the Power Corridor alternative, defendants should have studied it in more detail. Defendants do not dispute that the County Y alternative would likely have been less

the parties' arguments depend on any differences between them, I will refer to both the County Y alternative and the County V variation collectively as the County Y alternative.

34

environmentally destructive than the Power Corridor alternative. However, they contend that they were not required to study it in detail because they reasonably determined that it would not have diverted enough traffic to make the expansion of Highway 164 unnecessary, and that therefore it would not have satisfied the basic purpose of the project.

However, the EIS does not demonstrate that defendants conducted a reasonable inquiry into whether the County Y alternative would have satisfied the project's purposes. As far as the EIS reveals, defendants did no more than glance at the County Y alternative before dismissing it from detailed study. Although defendants state that the County Y alternative was not substantially different from the Power Corridor alternative (which was studied in more detail), they do not explain this conclusion. Indeed, defendants do not even identify the criteria they relied on when concluding that the two alternatives were substantially the same, and the criteria are not obvious. Although the EIS states that the County Y alternative would have been less efficient than the Power Corridor alternative due to conflicts with local traffic, defendants do not show that this conclusion was the product of any kind of expertise or careful study. Again, it appears that defendants simply glanced at the map and then formed an off-the-cuff opinion.

Instead of dismissing the County Y alternative based on this off-the-cuff opinion, defendants could have modeled it in an effort to confirm their suspicion that it was not substantially different from the Power Corridor alternative. Defendants have not argued that constructing such a model would have been unduly burdensome, and I have no reason to think that it would have been. Moreover, because the County Y alternative would

35

likely have resulted in substantially fewer environmental impacts than the Power Corridor alternative, the benefits of modeling the County Y Alternative appear to have been sufficient to justify further study under the rule of reason.

For these reasons, I find that defendants must on remand revisit the County Y alternative. They must either study this alternative in detail or elaborate on their reasons for dismissing it from detailed study. If defendants take the latter approach, they must show that their reasons for dismissing the alternative from further study are supported by sound data and methods. This means that if defendants conclude that the alternative is not substantially different from the Power Corridor alternative, they must explain the reasons supporting this conclusion, and those reasons must be more than simply an analyst's personal opinion that the two alternatives look similar when viewed side-by-side on a map. Similarly, if defendants conclude that the conflicts with local traffic on County Y would be substantial, they must show that this conclusion is supported by data and established principles of traffic engineering rather than speculation. Ideally, defendants will construct a model to test any hypothesis they form regarding the County Y alternative, as they did for the Power Corridor alternative.

Finally, I note that WEAL argues that defendants impermissibly rejected the County Y alternative on the ground that it was "not consistent with regional and county transportation system plans that document the importance of [Highway 164] as a major north-south arterial and the need for capacity expansion as part of the recommended systemwide transportation improvements." FEIS at 2-15. WEAL argues that this is nothing more than an unjustified assumption that Highway 164 must be expanded. I agree that this

36

reason is somewhat circular and that defendants cannot use the need for additional capacity on Highway 164 as a reason for refusing to study alternative means of providing that capacity. See Simmons, 120 F.3d at 668-70. The very point of the reasonable alternatives exercise is to determine whether less destructive alternatives might achieve the purpose of the project. Here, defendants seem to have simply assumed that Highway 164 must be expanded to four lanes because local transportation plans document the need for additional capacity. Again, however, defendants must examine whether it is possible to provide this capacity through an alternative that is less environmentally destructive than expanding the highway to four lanes.

**E.    Failure to Prepare Supplemental EIS.**

WEAL next argues that defendants should have prepared a supplemental EIS based on two events that occurred since the March 6, 2002 ROD. First, plaintiffs note that defendants changed the configuration of the project by replacing three overpasses with at-grade crossings and intersections. They argue that defendants should have reevaluated the environmental effects of the project in light of these changes. Second, plaintiffs argue that defendants should have reevaluated the project based on land use plans adopted by the Town of Richfield and the Village of Sussex, two municipalities located on the Highway 164 corridor.

NEPA does not address whether an agency must supplement an EIS. Marsh v. Or. Natural Res. Council, 490 U.S. 360, 370 (1989). However, CEQ regulations impose a duty on all federal agencies to supplement an EIS when there "are significant new circumstances or information relevant to environmental concerns and bearing on the

37

proposed action or its impacts." 40 C.F.R. § 1502.9(c). In discussing the standard of judicial review of an agency's decision not to prepare a supplemental EIS, the Supreme Court has recognized that "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized." Marsh, 490 U.S. at 373. However, "NEPA does require that agencies take a 'hard look' at the environmental effects of their planned action, even after a proposal has received initial approval." Id. at 374. In determining wether new information requires supplementation, courts are to apply a "rule of reason" that "turns on the value of the new information to the still pending decision-making process." Id. Because the environmental significance of new information is normally a question of fact that implicates substantial agency expertise, the court must defer to "the informed discretion of the responsible federal agencies." Id. at 376-77 (internal quotation marks omitted). In applying this standard of review, a court must ensure that the agency "conducted a reasoned evaluation of the relevant information and reached a decision that, although perhaps disputable, was not 'arbitrary or capricious.'" Id. at 385.

In a decision that predates Marsh, the Seventh Circuit established a similar standard of review. Wisconsin v. Weinberger, 745 F.2d 412, 418 (7th Cir. 1984). The court also noted that the decision whether to supplement an EIS "is made in light of an already existing, in-depth review of the likely environmental consequences of the proposed action [i.e., the original EIS]." Id. at 418. Thus, the "principal factor an agency should consider in exercising its discretion whether to supplement an existing EIS because of new information is the extent to which the new information presents a picture of the likely environmental consequences associated with the proposed action not envisioned by the

38

original EIS." Id. "The issue is whether the subsequent information raises new concerns of sufficient gravity such that another, formal in-depth look at the environmental consequences of the proposed action is necessary." Id. Again, the agency's view of whether the new information raises such concerns is entitled to some deference. Id. Therefore, "an agency cannot have acted arbitrarily or capriciously in deciding not to file a [supplemental EIS] unless the new information provides a seriously different picture of the environmental landscape such that another hard look is necessary." Id. (emphasis in original).

In the present case, WEAL does not show that the new information seriously changes the environmental picture. With respect to the changes in the highway's configuration, WEAL cites the opinions of several citizens and purported environmental experts who state in conclusory fashion that "undoubtedly" the configuration changes are significant. (Pls.' Opening Br. at 21.) However, WEAL does explain why the changes are significant or show that they undermine any existing analysis in the EIS, and I have no reason to credit the conclusory opinions cited by WEAL. Therefore, this claim fails.

Likewise, WEAL does not explain why the land use plans adopted by the Villages of Richfield and Sussex seriously change the environmental picture. Although WEAL describes these plans as "inconsistent with the expansion project" (Pls.' Opening Br. at 21), the Village of Richfield has opposed the expansion project all along, and its most recent land use plan seems to be nothing more than a continuation of the position it expressed to defendants during preparation of the existing EIS. See FHWA 04134 (letter from Town (now Village) of Richfield stating that its residents oppose expansion of Highway 164);

39

Town of Richfield Resolution 99-10-01 (October 1999) (resolution opposing expansion of Highway 164), underline(available at) http://www.dot.wisconsin.gov/projects/d2/wis164stud/richfield .htm (viewed Sept. 14, 2009). Further, WEAL does not sufficiently explain how the Village of Sussex's recent land use plans differ from the description contained in the original EIS. FEIS at 3-2 to 3-3. Thus, WEAL does not meet its burden of establishing that the recent land use plans seriously change the environmental picture such that another hard look is necessary.

## IV. FEDERAL AID HIGHWAY ACT

The Federal Aid Highway Act ("FAHA") is a statute authorizing the use of federal funds to complete state highway projects, such as the expansion of Highway 164. WEAL argues that in allowing WisDOT to use federal funds in connection with the expansion, the FHWA did not comply with two procedural requirements contained in FAHA – the requirement that the FHWA consider the effects of the project on air quality and the requirement that the FHWA ensure that WisDOT held a public hearing on the project. FAHA does not create a private right of action to redress purported violations, and thus WEAL may prevail only if it shows that the FHWA's actions violated the APA. <u>Jersey Heights Neighborhood Ass'n v. Glendening</u>, 174 F.3d 180, 186 (4th Cir. 1999).

### A.      Failure to Consider Effects of Air Pollution.

WEAL first argues that the FHWA did not adequately assess the effect of the project on air pollution. However, WEAL does not fully develop this argument, and therefore it is waived. <u>See</u> <u>Harper v. Vigilant Ins. Co.</u>, 433 F.3d 521, 528 (7th Cir. 2005) (holding that poorly developed argument is waived). WEAL assumes that 23 U.S.C. § 109(h) requires

40

the FHWA to perform an analysis of air quality that is distinct from its analysis under NEPA. However, WEAL cites no authority supporting its interpretation of Section 109(h), and the only authority I have found states that an adequate analysis under NEPA will satisfy Section 109(h) and that no separate analysis is required. Audobon Naturalist Soc'y v. U.S. Dep't of Transp., 524 F. Supp. 2d 642, 706-08 (D Md. 2007). Further, although WEAL suggests that the discussion of air quality does not satisfy NEPA, WEAL makes no serious attempt to develop this argument. WEAL states only that the EIS does not discuss greenhouse gases, and that therefore the FHWA must have violated NEPA. However, as illustrated above, the NEPA inquiry is complex and nuanced, and the few sentences that WEAL devotes to this argument are too few to enable me to perform a meaningful analysis.

Nonetheless, it is apparent that one of the potential indirect effects of the Highway 164 expansion, and one of the cumulative impacts of this and other highway projects in the region, will be damage to air quality. Thus, on remand defendants must incorporate air quality into their discussion of indirect and cumulative impacts. That is, they must examine how any increase in urbanization attributable to new and expanded highways might affect air quality in the region.

**B.     Failure to Hold a Public Hearing.**

FAHA provides that when a state's proposed highway project "involv[es] the bypassing of, or going through, any city, town, or village," the state must certify to the FHWA (on behalf of the Secretary of Transportation) that "it has had public hearings, or has afforded the opportunity for such hearings." 23 U.S.C. § 128(a). The parties agree

41

that this provision required WisDOT to hold a public hearing on the proposal to expand Highway 164. WEAL argues that WisDOT did not hold a public hearing that satisfies this provision.

WisDOT considers itself to have held a public hearing, but the format of WisDOT's hearing did not match traditional expectations – traditional expectations being a hearing at which the agency makes a presentation to an audience and the audience members are, in turn, allowed to publicly express their views. Instead of a traditional public hearing, WisDOT held an "open house." FEIS at 9-1. It held this open house at a local church over the course of seven hours. WisDOT provided attendees with a handout "that included a summary of project purpose and need; alternatives and their impacts; information about upcoming activities and contacts; frequently asked questions and responses; and a comment form." FEIS at 9-2. Attendees could also walk around the room and view exhibits about the project. FEIS at 9-1. Representatives from WisDOT attended the open house and "were available to explain project alternatives, answer questions, and explain procedures for providing testimony." Id. However, the format that WisDOT used did not permit members of the public to publicly express their views directly to WisDOT representatives or to other members of the public. Rather, WisDOT required those who wished to express an opinion or make a suggestion to either dictate their comments in private to a court reporter or complete written comment forms. Id.

WEAL argues that WisDOT's open house was not a "public hearing" within the meaning of Section 128(a). The statute does not define "public hearing" or indicate what format the hearing must take. Sierra Club v. U.S. Dep't of Transp., 310 F. Supp. 2d 1168,

42

1206 (D. Nev. 2004).  Although the FHWA has adopted a regulation prescribing features that all public hearings must include, 23 C.F.R. § 771.111(h), the regulation is not comprehensive and does not indicate whether an agency can satisfy the public hearing requirement by means of an open house.  Defendants argue that although the regulations do not define "public hearing" the FHWA has elsewhere interpreted "public hearing" to include open houses and that I must defer to this interpretation pursuant to Chevron U.S.A. Inc. v. National Resources Defense Council, Inc., 467 U.S. 837, 844 (1984).

However, defendants do not show that the FHWA has actually interpreted Section 128(a)'s reference to "public hearings" to include open houses.  The document they cite is a report drafted by a consulting firm at the request of the Department of Transportation. The report provides information to state agencies regarding public involvement in transportation projects.  See Department of Transportation, Public Involvement Techniques for Transportation Decision-making (September 1996) (hereinafter "Public involvement Techniques"), available at http://www.fhwa.dot.gov/reports/pittd/cover.htm (viewed Sept. 14, 2009).  The cover of the report contains the following notice: "The contents of this report reflect the views of the contractor, who is responsible for the accuracy of the data presented herein.  The contents do not necessarily reflect the official policy of the Department of Transportation.  This report does not constitute a standard, specification or regulation."  (Emphasis added.)  Accordingly, the cited document does not purport to be the FHWA's official interpretation of Section 128(a), and defendants submit no other

43

evidence showing that the FHWA interprets the term "public hearing" to include open houses.[14]    Accordingly, there is no official agency position to defer to.

Even if the consulting firm's memorandum were the FHWA's official interpretation of the public hearing requirement, the memorandum does not say that an open house may be used as a substitute for a public hearing.  Instead, the report treats public hearings and open houses as two different things.   The report has a chapter discussing "Public meetings/hearings"  and  a  separate  chapter  discussing  "Open  houses/open  forum hearings."  See Public Involvement Techniques, table of contents.  The chapter on public hearings notes that "[p]ublic hearings are required by the Federal government for many transportation projects," but it does not say that open houses count as public hearings.  To be sure, the report states that an open house may be held in conjunction with a public hearing, but it does not say that an open house can be held in lieu of a public hearing.  Id. at Ch. 2 (reporting that the Georgia DOT "expands the question and answer period by holding an open house in conjunction with a public hearing").

Finally, even if the FHWA's official interpretation is that open forums of the type held by WisDOT satisfy the public hearing requirement, I find that this interpretation is unreasonable.  Christensen v. Harris County, 529 U.S. 576 (2000) (Chevron deference applies  only  where  an  agency's  interpretation  is  a  reasonable  interpretation  of  an ambiguous statute).  Although the term "public hearing" is not unambiguous in all respects,

_____

[14]In Sierra Club, a Nevada district court found that in 1987 the FHWA's Office of Environmental Policy issued a memorandum expressing the view that an open house was a public hearing within the meaning of Section 128(a).  310 F. Supp. 2d at 1207.  However, defendants have not made this memorandum part of the record in the present case or indicated whether the FHWA considers it to represent its current official position.

this much is clear: a public hearing must allow citizens an opportunity to express their views in front of agency representatives and other citizens. As defendants state in their brief, the word "hearing" as used in Section 128(a) means "the opportunity to be heard, to present one's side of the case, or to be generally known or appreciated." (Defs.' Resp. Br. at 32.) In the context of the statute, the adjective "public" means "accessible to or shared by all members of the community." Webster's Third New International Dictionary Unabridged 1836 (1986).[15] Reading these words together, the only reasonable interpretation is that a "public hearing" requires, at the least, an opportunity for citizens to make their views generally known to the agency and the community.

The open house held by WisDOT did not afford such an opportunity. Instead, WisDOT allowed citizens to dictate their views to a court reporter in private or submit written comments. Although these views were later incorporated into the administrative record for the project, the open house afforded no direct opportunity for citizens to make their views generally known. It offered no opportunity for one citizen to learn about the views of a fellow citizen, no opportunity for one citizen to influence another. Presumably, after the open house was over and all the dictated comments were transcribed, an interested member of the community could have made an open records request and read the comments made by his or her fellow citizens. But this is no substitute for an opportunity to make one's views generally known through a forum that is "accessible to or shared by all members of the community." A public hearing provides a direct link between

---

[15]Indeed, the dictionary uses "public hearing" as an example of this definition of the adjective "public."

the citizen and his or her community, not an indirect link filtered through court reporters and open records requests.

In short, an open house at which citizens can express their views to no one other than a court reporter is not a public hearing. Such an open house is not what is called to the mind of a reasonable person when he or she reads or hears the words "public hearing."[16] Such an open house was certainly not what the members of the House Public Works Committee thought of when they reported on the public hearing provisions of Section 128(a). See H.R. No. 91-1554, at 4-5 (1970), as reprinted in 1970 U.S.C.C.A.N. 5392, 5395-97 ("The hearing itself was meant to be a 'town hall' type meeting in which people are free to express their views . . . . [I]ts purpose is to encourage public comment and discussion . . . ."). Accordingly, the FHWA's decision to approve the Highway 164 expansion was not in accordance with FAHA and must be set aside pursuant to the APA.

## V.  CLEAN WATER ACT

Section 404 of the CWA states that a person must obtain a permit from the Corps before he or she may discharge dredged or fill material into navigable waters of the United States, which include certain wetlands. 33 U.S.C. § 1344 (codification of § 404); Town of

---

[16]I am aware that the Nevada district court found that a reasonable person could consider an open house to be a public hearing, Sierra Club, 310 F. Supp. 2d at 1207-08, but I must respectfully disagree. The court in Sierra Club seemed to conclude that so long as the open house had some of the trappings of a public hearing, it could be considered a public hearing. However, the court failed to recognize that the plain meaning of the term "public hearing" requires, at the least, an opportunity for citizens to publicly express their views. The court seemed to think that the opportunity to "make comments in a variety of means, both oral and written" was enough to satisfy this requirement, id. at 1208. But as I have explained, the opportunity to make comments is not enough. The public must be allowed to make comments in a forum that will allow those comments to be immediately and generally known.

Case 2:05-cv-00212-LA    Filed 09/14/09    Page 46 of 48    Document 167

Norfolk v. U.S. Army Corps of Eng'rs, 968 F.2d 1438, 1445 (1st Cir. 1992).[17]  Guidelines developed by the Environmental Protection Agency in conjunction with the Corps govern the issuance of a § 404 permit.  33 U.S.C. § 1344(b)(1); Greater Yellowstone Coalition v. Flowers, 359 F.3d 1257, 1269 (10th Cir. 2004).  These guidelines, known as § 404(b)(1) guidelines, are published in 40 C.F.R. Part 230.  See Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1524-25 (10th Cir. 1992).  The Corps also has its own regulations that apply to the permit process, which are published in 33 C.F.R. Part 320.  See Town of Norfolk, 968 F.2d at 1445.

The § 404(b)(1) guideline relevant to the present case is 40 C.F.R. § 230.10(a), which provides that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."  Plaintiffs argue that the County Y alternative discussed above was a practicable alternative that would have had a less adverse impact on the aquatic ecosystem, and that the Corps improperly concluded based on the deficient EIS that the County Y alternative was not practicable.  At oral argument, counsel for the Corps agreed that if the EIS's discussion of reasonable alternatives was found to be deficient, the Corps's decision to issue the two permits at issue in this case would have to be vacated.  (Tr. at 37 & 39.)  As discussed above, I find that the EIS's discussion of reasonable alternatives was deficient, and therefore the Corps's decisions with respect to

---

[17]No one disputes that the Corps has jurisdiction over the wetlands at issue in the present case, and thus this case does not implicate the Supreme Court's decision in Rapanos v. United States, 547 U.S. 715 (2006).

47

the two permits must be vacated and the matter remanded to the Corps for reconsideration.

## VI.  CONCLUSION

For the reasons stated, the parties' motions for summary judgment are **GRANTED IN PART** and **DENIED IN PART**.[18]  Pursuant to the APA, the March 6, 2002 ROD and the Corps's decisions regarding the 2005 and 2006 wetland-fill permits are **VACATED,** and this matter will be **REMANDED** to the respective agencies so that they may cure the noted deficiencies and reconsider their decisions.  A telephonic status conference will be held on **October 29, 2009 at 10:30 a.m.,** at which time the parties shall be prepared to discuss whether further proceedings are necessary or whether final judgment should be entered.

Dated at Milwaukee, Wisconsin, this 14 day of September, 2009.

/s_____

LYNN ADELMAN
District Judge

---

[18]On July 20, 2009, plaintiffs filed a motion asking the court to take judicial notice of a draft EIS relating to a different highway project and to file additional citations to the record.  Because I did not find it necessary to consult the draft EIS or to review additional citations, the motion is denied.

48