**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN**

---

**HIGHWAY J CITIZENS GROUP, U.A.
and WAUKESHA COUNTY
ENVIRONMENTAL ACTION LEAGUE**
        Plaintiffs,

      v.                                          Case No. 05-C-0212

**UNITED STATES DEPARTMENT OF
TRANSPORTATION; Secretary of
Transportation RAY LaHOOD;
FEDERAL HIGHWAY ADMINISTRATION;
Acting Administrator of Federal Highway
Administration JEFFREY PANIATI; U.S. ARMY
CORPS OF ENGINEERS; District Engineer
COLONEL JON L. CHRISTENSEN; and FRANK
BUSALACCHI, Secretary of the State of Wisconsin
Department of Transportation**
        Defendants.

---

## DECISION AND ORDER

Plaintiffs Highway J Citizens Group, U.A. ("Citizens"), and Waukesha County Environmental Action League ("WEAL") brought this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, on behalf of their members, alleging that defendants, the Federal Highway Administration ("FHWA"), Army Corps of Engineers (the "Corps") and the Wisconsin Department of Transportation ("WisDOT"), acted arbitrarily and capriciously in approving a highway-expansion project in Southeastern Wisconsin. On September 14, 2009, I granted plaintiffs' motion for summary judgment in part, finding that FHWA and WisDOT approved the project in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, and the Federal Aid Highway Act ("FAHA"), 23

U.S.C. § 101 et seq., and that the Corps issued two permits for the project in violation of Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344. I vacated the agencies' decisions and ordered the agencies to comply with NEPA, FAHA and the CWA and then reconsider their decisions. Before me now is defendants' motion to reconsider my September 14 decision. I assume that the reader is familiar with the facts and legal issues as stated in my prior decision.

## I. NEPA

In my prior order, I found that defendants violated NEPA by failing to prepare an adequate environmental impact statement ("EIS") before approving the Highway 164 project. I found that the EIS was deficient in the following respects: (1) it contained an inadequate discussion of indirect effects, (2) it contained an inadequate discussion of cumulative effects, and (3) it contained an inadequate discussion of reasonable alternatives. Defendants ask that I reconsider these conclusions.

**A.	Discussion of Indirect Effects.**

An EIS must include a discussion of indirect effects and their significance. 40 C.F.R. § 1502.16(b). Council on Environmental Quality ("CEQ") regulations define indirect effects as those that are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). Indirect effects "include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." Id.

In my prior decision, I found that defendants' discussion of indirect effects was deficient because it was conclusory. (Dec. & Order at 25-28.) As I explained, the EIS simply concludes with no analysis that expanding the highway to four lanes would not "substantially influence the type, intensity, or location of development over what is already planned for and expected to occur with or without improvements to County J/WIS 164." As a basis for its conclusion, the EIS lists several comments made by local municipalities, but the comments are one-line assertions and the EIS makes no effort to determine what if anything they are based on or to explain how they justify defendants' conclusion. Nor does the EIS analyze any other data or information or describe how it might have led defendants to conclude that expansion of the highway would have no substantial indirect effects. Thus, I found that defendants had failed to take the required "hard look" at indirect effects. Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976) (agency must demonstrate that it "has taken a 'hard look' at environmental consequences").

In their motion for reconsideration, defendants argue that Chapter 3 of the EIS supplies the missing analysis. However, Chapter 3 does no more than identify certain features of the surrounding environment. It does not discuss how that environment might be affected by expanding the highway to four lanes. It therefore does not cure the defects I identified in my prior decision.

Defendants next contend that the EIS's statement that "[t]he land use plans in [Waukesha and Washington Counties] were developed assuming County J/WIS 164 would be expanded into a 4-lane facility" adequately explains their conclusion. FEIS at 4-2. But the fact that local governments may have formulated land use plans on the assumption

3

that the highway would be expanded does not speak to, much less explain, the EIS's conclusion that the expansion would have no substantial effect on development and thus no indirect effects. The fact that local land use plans may have anticipated the highway expansion presumably means that such plans anticipated that the expansion would have certain effects. The problem with the EIS is that it neither identifies these effects nor explains why they might or might not occur.

Defendants also mistakenly assert that I "rejected the conclusion" reached by their "experts." (Defs.' Br. [Docket #169] at 9.) On the contrary, I did not reject defendants' conclusion but held only that they failed to <u>explain</u> how they arrived at it, and therefore failed to show that they had taken a hard look at the indirect effects of the proposed expansion. On remand, if defendants take the required hard look and again conclude that the expansion will not substantially influence development, their discussion will be sufficient. However, a hard look at indirect effects requires an explanation. Defendants cannot simply list cursory comments or other information and then assert a conclusion; rather, they must demonstrate the path of their reasoning from whatever data they rely on to their conclusion that expansion will have no substantial effect. In other words, defendants must "show their work" to some extent so that the court can have confidence that defendants' conclusion was the product of a hard look.

Finally, defendants seem to contend that the EIS adequately identifies the indirect effects attributable to the expansion to four lanes and that I must defer to the agencies' decision to characterize those effects as "not substantial." (Defs.' Br. [Docket #169] at 10-11.) However, as discussed, the EIS merely lists what "[o]ne or more local governments"

4

identified as possible indirect effects.  FEIS at 4-6.  It does not reveal whether defendants actually studied these possibilities and, if so, whether or not defendants agree with the local governments and to what extent and why.  Thus, the EIS does not adequately identify indirect effects.

**B.     Discussion of Cumulative Effects.**

Regulations promulgated by the CEQ require that an EIS include a discussion of the federal action's cumulative impact.  40 C.F.R. § 1508.25.  "Cumulative impact" is:

> the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.  A proper cumulative impacts analysis will assess the proposed action in light of other activity that has affected or will affect the same environmental resources. The goal is to highlight any environmental degradation that might occur if the minor effects of multiple actions accumulate over time.  For example, although a single highway-improvement project might have minimal environmental consequences, combining that project with those that preceded it and others that are anticipated might reveal a more serious overall impact.  Placing the project into a broader context that includes these recent and anticipated projects helps prevent "the tyranny of small decisions."  Council on Environmental Quality, <u>Considering Cumulative Effects Under the National Environmental Policy Act</u> 1 (January 1997) <u>available at</u> http://ceq.hss.doe.gov/nepa/ccenepa/ccenepa.htm (viewed March 19, 2010).

In my prior decision, I found the EIS's discussion of cumulative impacts deficient because it assumed the continued urbanization of the project area regardless of whether new highways are built. (Dec. & Order at 28-33.) In other words, the EIS fails to analyze the extent to which the expansion of Highway 164, when combined with other past, present and reasonably foreseeable future highway-expansion projects, will contribute to urbanization in Waukesha and Washington Counties. Although the EIS acknowledges the cumulative impact that the trend towards urbanization in these counties will have on environmental resources, it makes no attempt to assess the degree to which highway-expansion projects contribute to this trend. Instead, the EIS assumes that the area will continue to urbanize at more or less the same rate regardless of whether such projects are implemented. Once again, the EIS's failure is one of analysis; it makes no attempt to explain to decisionmakers and the public the environmental impacts of decisions to build or expand roads. Because the EIS fails to show that it took the hard look required by NEPA, I found the discussion of cumulative effects inadequate.

In their motion for reconsideration, defendants argue that FHWA has "no ability to prevent urbanization or suburban sprawl in the Milwaukee metropolitan area." (Reply. Br. [Docket #175] at 7.) Relying on the Supreme Court's decision in <u>Department of Transportation v. Public Citizen</u>, 541 U.S.752 (2004), defendants argue that an agency need not analyze a cumulative effect in an EIS if the agency has no ability to prevent it. In <u>Public Citizen</u>, the Court held that "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be

6

considered a legally relevant 'cause' of the effect," and therefore the agency need not consider the effect in its NEPA analysis. Id. at 770.

In making this argument, defendants commit the same error that made the EIS deficient in the first place: they assume with no analysis that their decision will not impact urbanization and suburban sprawl. This is the precise issue that defendants must examine before they can be said to have performed a satisfactory analysis of cumulative effects. They cannot simply assume that their actions will have no effect on these phenomena. If defendants take a hard look at this issue and determine that their actions will have no effect on urbanization and suburban sprawl (and the environmental impacts associated with these phenomena), they may discharge their obligations under NEPA by explaining why this is so. If, on the other hand, defendants conclude that their actions contribute to urbanization and its associated environmental effects, then they must attempt to assess the incremental impact of their decisions on such phenomena so that agency decisionmakers can take this impact into account when deciding whether to implement the project.

Defendants seem to argue that they need not analyze the causes of urbanization unless they have the power to prevent it altogether. However, although defendants cannot entirely prevent the urbanization of rural areas, it does not follow that their actions do not contribute to it and to the environmental effects associated with it. Again, it is the agencies' duty under NEPA to identify the extent to which its actions contribute to the cumulative environmental impact. Although Waukesha and Washington Counties may continue to urbanize whether or not defendants expand Highway 164, the addition of capacity on that

7

highway (in combination with other past, present and future highway-expansion projects) may cause the area to urbanize more quickly and/or to a greater extent than it would otherwise, and thus the agencies' action may have a greater impact on wetlands, surface water, air quality, upland woods and other environmental resources than the EIS reveals. To take the hard look that NEPA requires, the agencies must examine this issue.

**C.     Consideration of Reasonable Alternatives.**

An EIS must discuss alternatives to a proposed action.  42 U.S.C. § 4332(c)(iii). The CEQ regulations specify that the agency preparing an EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a).

In my prior decision, I found that the EIS failed to adequately discuss the reasons for eliminating the "County Y" alternative from detailed study.  In their motion for reconsideration, defendants argue that I should find that this issue is moot because the County Y alternative is no longer viable in light of the fact that a significant portion of Highway 164 has already been expanded to four lanes.  However, whether the County Y alternative is no longer viable is an issue that the agency can examine on remand.  If after taking a more thorough look at the County Y alternative the agency determines that it is no longer viable, the agency may eliminate it from detailed study on that basis.  But the fact remains that the present EIS contains an inadequate discussion of the County Y alternative.  The agency must cure this deficiency on remand.

8

## II. FEDERAL AID HIGHWAY ACT

The Federal Aid Highway Act ("FAHA") authorizes the use of federal funds to complete state highway projects, such as the expansion of Highway 164.[1] It provides that when a state's proposed highway project "involv[es] the bypassing of, or going through, any city, town, or village," the state must certify to the FHWA (on behalf of the Secretary of Transportation) that "it has had public hearings, or has afforded the opportunity for such hearings." 23 U.S.C. § 128(a). In its motion for summary judgment, WEAL argued that WisDOT failed to hold a public hearing. Defendants responded by stating that they held an open house, that FHWA concluded that an open house satisfied the public-hearing requirement of Section 128(a), and that I must defer to FHWA's interpretation. However, I found that FHWA had not actually interpreted the public-hearing requirement, and that therefore there was noting to defer to. (Dec. & Order at 43-44.) I further found that the plain meaning of the term "public hearing" was a hearing at which members of the public could publicly express their views to the agency, rather than an open house at which members of the public could only offer written submissions or privately relate comments to a court reporter. (Dec. & Order at 44-46.)

---

[1]Subsequent acts have superceded the Federal Aid Highway Act. However, because the earliest version of the public-hearing requirement appears to have been added to federal highway law as part of the Federal Aid Highway Act of 1950, I will use "Federal Aid Highway Act" as the popular name for this law. See Senate Rep. No. 2044 (1950), as reprinted in 1950 U.S.C.C.A.N. 3660, 3666-67.

9

In their motion for reconsideration, defendants dispute my finding that the open house did not permit members of the public to publicly express their views.[2] They argue that because they held the open house in one room, members of the public could talk to each other and also overhear comments other citizens made to court reporters and agency representatives, and that therefore the comments were "public."

However, defendants' understanding of the term "public" as used in the phrase "public hearing" is tortured and contrary to ordinary usage. As I discussed in my prior decision, the plain meaning of "public hearing" is a hearing that provides citizens with the opportunity to make their views <u>generally</u> known to the agency and the community. (Dec. & Order at 45.) Thus, a public hearing is one at which a member of the public may present her views to agency representatives in front of the members of the community who attend the hearing. A member of the public speaking privately to an agency representative or a court reporter does not constitute a public hearing merely because some other members of the public might happen to be within hearing distance. Further, although members of the public who attend an open house can speak with each other as they walk around and view the exhibits on display, this does not provide them with the opportunity to make their views generally known to attendees. WisDOT's open house was held over a seven-hour

---

[2]Defendants also suggest that I relied on materials outside the administrative record when determining whether members of the public could publicly express opinions at the open house. However, I relied exclusively on the summary of the open house provided in the EIS. <u>See</u> FEIS 9-1 ("The public hearing format was open house . . . . Two formats were available for providing testimony – oral presentations to a court reporter and written comment forms at the hearing.").

10

period, FEIS at 9-1, and thus it is unlikely that a citizen could have spoken to all 312 attendees at once, as she could have if WisDOT had held a real public hearing.

Next, defendants reiterate their contention that I should have deferred to FHWA's interpretation of the public-hearing requirement. However, they do not actually show that FHWA ever rendered such an interpretation. As explained in my prior decision, the document that defendants cite states that it does <u>not</u> express the agency's official views. (Even if it did, it does not state that an open house satisfied the public-hearing requirement.) (Dec. & Order at 43-44.) Thus, there is no official agency interpretation to defer to.[3]

Finally, defendants argue that my interpretation of the public-hearing requirement is based on legislative history, and that my understanding of the legislative history is incorrect. However, I did not base my interpretation on legislative history but rather on the plain meaning of the phrase "public hearing," which I found to be unambiguous insofar as it applied to the present case. (Dec. & Order at 44-46.) Because I based my interpretation on plain meaning, I did not need to consult legislative history. <u>See, e.g.</u>, <u>Valero Energy Corp. v. United States</u>, 569 F.3d 626, 634 (7th Cir. 2009) (stating that where statute is

---

[3]I also note that defendants contend that their interpretation is entitled to deference under <u>Chevron U.S.A. Inc. v. Natural Res. Def. Council</u>, 467 U.S. 837 (1984). However, <u>Chevron</u> deference applies only to agency interpretations contained in the agency's formal regulations. It does not apply to less formal interpretations, such as those contained in opinion letters, policy manuals and the like. <u>Christensen v. Harris County</u>, 529 U.S. 576, 586-87 (2000). Although these less formal interpretations are entitled to respect, their interpretative force is limited to their power to persuade. <u>Id.</u> at 587. In the present case, FHWA has not offered <u>any</u> interpretation (other than the interpretation presented in its lawyer's briefs, which is not entitled to deference, <u>Bowen v. Georgetown Univ. Hosp.</u>, 488 U.S. 204, 212-13 (1988)), much less an interpretation embodied in a formal regulation. Thus, <u>Chevron</u> deference does not apply.

11

unambiguous, the court need not consult legislative history). However, in the course of my interpretation, I cited the House Public Works Committee's statement that the public hearing "was meant to be a 'town hall' type meeting in which people are free to express their views." H.R. No. 91-1554 (1970), as reprinted in 1970 U.S.C.C.A.N. 5392, 5396.[4] I did not cite this statement in an attempt to rely on legislative history but rather to show that the term "public hearing" ordinarily means something more than an open house of the type held by WisDOT.

In their motion for reconsideration, defendants argue that the legislative history does not show that a Section 128(a) public hearing was to be of the town hall variety. Again, because I find that the meaning of "public hearing" as applied to the present case is unambiguous, I need not refer to legislative history. For the sake of completeness, however, I note that the legislative history cited by defendants does not support their assertion that an open house satisfies the public-hearing requirement. Defendants point to a FHWA memorandum found in the records of a senate subcommittee, which discusses procedures for holding Section 128(a) public hearings. (Mot. for Recons. Ex. 15 [Docket #168-19] at 776-81.) However, defendants make no attempt to connect this memorandum to the actual language of the statute. Further, the memorandum does not authorize open houses in lieu of public hearings. The memorandum itself requires a "public hearing," and

---

[4]The House Report that I cited accompanied the Federal Aid Highway Act of 1970, Pub. L. No. 91-605, 84 Stat. 1713. Although the 1970 Act amended Section 128(a) to Title 23, it did not create the public-hearing requirement. See Federal Aid Highway Act of 1970, Pub. L. No. 91-605, § 135, as reprinted in 1970 U.S.C.C.A.N. 2001, 2026-27. The public-hearing requirement appears to have originated in the Federal Aid Highway Act of 1950. See supra note 1.

12

as I have explained, the plain meaning of this phrase does not include an open house. In fact, the memorandum, like the text of Section 128 itself, 23 U.S.C. § 128(b), requires the state to make "a verbatim written transcript of the oral proceedings at each public hearing." (Mot. for Recons. Ex. 15 [Docket #168-19] at 780.) It would be virtually impossible to transcribe all oral proceedings at an open house. This implies that the FHWA contemplated that states would hold "town hall" style hearings rather than open houses.[5] The FHWA memorandum is thus in accord with the statement of the House Public Works Committee that I cited in my prior decision.

In sum, I conclude that an open house is not a "public hearing" within the meaning of Section 128(a). My interpretation is based on the plain meaning of "public hearing," and thus I need not refer to legislative history. Insofar as the legislative history is relevant, however, it supports my interpretation.

### III. CONCLUSION

For the reasons stated, defendants' motion for reconsideration is **DENIED**. A telephonic status conference will be held **April 7, 2010 at 2:00 p.m. CDT** at which time the parties shall be prepared to discuss whether further proceedings are necessary or whether final judgment should be entered.

---

[5]Defendants might argue that transcribing the comments dictated to court reporters at an open house fulfills this requirement. However, "oral proceedings" does not mean only the public's oral comments, but also the speeches and oral presentations made by the agency to the public. WisDOT did not transcribe the agency's oral presentations.

13

Dated at Milwaukee, Wisconsin, this 23 day of March, 2010.

/s_____
LYNN ADELMAN
District Judge